## THE PEOPLE v. WHITE.

An indictment for murder at the common law viz : charging the act to have been done with *malice aforethought*, is not vitiated by the addition of the words, *that the act was done from a premeditated design to effect the death of the deceased*; such latter words may be rejected as surplusage.

An entry endorsed on an inquisition of murder taken by a coroner, purporting to be the examination of witnesses, will not be recognized as duly taken under the statute if it have not a *jurat* or certificate of the coroner, that the witnesses were sworn, and it be not shown to be in the hand writing of the coroner, or taken under his direction, and that the witnesses were in fact sworn, and that their testimony is stated truly.

*It seems* that depositions taken *in pencil*, instead of being properly written out, would not be considered as taken in compliance with the statute.

The fact that a judge in his charge to a jury in a criminal case, after alluding to the influence of proof of good character in a doubtful case, called the attention of the jury to the want of such proof in the case before them, is no cause for granting a new trial, where in other respects the charge is unexceptionable.

The *associate judge* of the common pleas of the city of New York, appointed under and by virtue of the act of 1st April, 1839, has authority, two aldermen of the city being associated with him, to hold a court of *oyer and terminer* in that city.

Where a trial is *commenced* in the oyer and terminer of New York, the *circuit judge*, the *associate judge*, and *two aldermen* presiding, and the circuit judge retires from the bench during the progress of the trial, and does not again return whilst it continues, the trial is notwithstanding regular, and if a conviction takes place, the sentence of the law will not be suspended on account of such departure of the circuit judge.

THE prisoner was convicted in July, 1839, at the New-York oyer and terminer, of the murder of one Peter Fitzpatrick. The first count of the indictment charged, that the prisoner, on the 13th of February, 1839, with force and arms, &c. at the first ward of the city of New York, in and upon Fitzpatrick, *feloniously, wilfully and of his malice aforethought*, and from a premeditated design to effect the death of *Fitzpatrick*, did make an assault ; and with a certain knife, &c., in and upon the groin of Fitzpatrick, *feloniously, wilfully and of his malice aforethought, and from a premeditated design to effect his death*, did strike and thrust, &c. thereby giving him a mortal wound, of which he instantly died.

At the trial, the counsel for the prisoner took a bill of exceptions, in which it was stated that the cause came on for trial at a court of oyer and terminer, held in and for the city and county of New-York, on the 10th July, 1839, before the Hon. Ogden Edwards, circuit judge for the first circuit, William Inglis, one of the associate judges of the court of common pleas for the city and county of New-York, appointed under and by virtue of the act of 1st April, 1839, entitled "an act to repeal the seventh section of the act *relating to the court of common pleas for the city, &c.* and to authorize the appointment of an additional judge ; " and Egbert Benson and Elijah F. Purdy, aldermen, &c. Under this organization, Judge Edwards presiding, a jury was empanelled, a tales directed, challenges decided, witnesses examined, and the opinon of the court pronounced by Judge Edwards on several questions that had arisen as to the admissibility or rejection of testimony, without any intimation that he intended to abandon the *bench* during the progress of the trial ; he then withdrew and continue dabsent during the remainder of the trial. Judge Inglis and the two aldermen remaining, and they presiding, the trial was continued.

The murder was perpetrated at the house of one Lawrence Gaffney. *Timpson,* a witness for the prosecution, testified that he saw White there ; and saw several men shoving him out of the door; after which he did not see him again. The district attorney then put this question to the witness ; " What did you see after that ? " The prisoner's counsel objected to this question, because nothing that was *said* or *done* in the absence of the prisoner was admissible. The court overruled the objection and the prisoner's counsel excepted.

*William H. Wright,* another witness for the people, testified that he knew White ; that he, the witness, was at Gaffney's, (where there was a house-warming,) several times in the course of the night, when the homicide was committed ; and gave evidence tending materially to fix the offence upon the prisoner. Wright had been examined before the police ; and his deposition taken there was read in evidence

The People v. White.

by the counsel for the prisoner. He there stated that he did not know White's name at the time; but now knew it. He was now cross-examined as to his deposition before the police, and said; " I did not express any doubt about who did the act. I did not then recollect his name." He admitted that he had been examined before the coroner, on the occasion of the ante-mortem inquest on Edward Dennon, who, as it now appeared, was wounded by the prisoner in the same affray. The inquest was taken February 13th, and was admitted by the district attorney, to have been duly filed by the coroner. There was an endorsment on it in pencil in these words: " *Witnesses.* Wm. H. Wright. Is a watchman. About 3 o'clock this morning, came along, &c. and found they were quarrelling, &c. and told the young men to go away. One of them came up and jerked the door open, and saw him make a motion to stab; and from the action of his arm have no doubt he did stab him, &c. Soon after saw him make another stab at another man, and he fell. The first man did not fall. Did not see but one man use any instrument. *Edward Dennon* was one of the party, &c. was stabbed, and did not know by whom, &c. *Doctor Charles Fitzpatrick* says he was called to this house about 3 o'clock; found the wounded man Dennon, &c."

The inquisition and the endorsement thereon were offered in evidence for the purpose of contradicting Wright's testimony on this trial. The district attorney objected to the reading of the endorsement, on the ground that it should first be proved that the testimony was reduced to writing from the witness' statement. That it was evidently, on its face, an imperfect statement; and not a part of the inquisition. That it had no *official signature*, or *authentication*, and might be a mere private memorandum of the coroner, or of some other person made for his own use. The court decided that the inquisition was admissible, but excluded the statement endorsed thereon. The prisoner's counsel excepted.

In charging the jury, the judge told them that the offence was within the first count of the indictment, should they be

of opinion that the killing took place either from premeditated design to effect the death either of Fitzpatrick or any other person; or that it was perpetrated by an act imminently dangerous to others, evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual. He added, "that in all doubtful cases, when the scales of justice are nicely poised, the evidence of good character and a virtuous life, had great weight in turning the balance in favor of the prisoner. That in this case there was an absence of such testimony on the side of the prisoner." To this observation there was also an exception. The jury found the prisoner guilty. The prisoner's counsel having procured a bill of exceptions to be signed, the sentence of the law was suspended, and the proceedings were brought up by *certiorari*, to obtain the advice of this court. The case was argued here by

*D. Graham, jun. & S. Stevens*, for the prisoner.

*J. R. Whiting*, (district attorney of the city and county of New-York,) for the people.

*By the Court*, COWEN, J. The first question made by the prisoner's counsel arises upon the record, and respects the organization of the court by which he was tried. It was composed of the circuit judge, who presided, Judge Inglis, an associate judge of the New-York Common Pleas, and Messrs. Benson and Purdy, city aldermen. The 2 *R. S.* 129, 2d ed. § 3, declares, that each of the circuit judges possesses the powers of a justice of the supreme court in the courts of oyer and terminer, and jail delivery. By § 5, the circuit judges respectively are to appoint the times and places of holding their circuit courts and the courts of oyer and terminer within their circuits; and by § 6, the respective circuit judges of the respective circuits comprehending the cities of New-York and Albany, have an unlimited discretion as to the place of holding their courts within these cities. By § 12, p. 130, it is made the duty of the respective circuit judges to attend at the appointed places; and preside in the courts of oyer and terminer, and by § 14, each justice of the su-

The People v. White.

preme court and each of the circuit judges, have power to preside in any court of oyer and terminer in this state, either for the whole or a, part of the time for which such court shall continue.   By § 28, courts of oyer and terminer in the city of New York may be held at the time and place at which any circuit court may have been appointed to be held, by one or more of the justices of the supreme court, or of the circuit judges, or *by the first judge* of the court of common pleas of the city and county, together with the mayor, recorder and aldermen of that city, or with any two of them.   So far the act of 1830.   Then came the stat- ute of April 11, 1834, which adds an associate judge to the city common pleas.   This was before holden by the first judge, with the mayor, recorder and aldermen, or by the first judge, mayor, or recorder alone, or in conjunction with one or more of the others; 2 *R. S.* 142, 2*d ed.* § 22, 23, and by *id.* 145, § 42, the first judge, mayor, recorder and aldermen, or any three of them, of whom the first judge, &c. should be one, had power to hold the general sessions. By the first section of the act of 1834, *Sess. Laws* of that year, *ch.* 94, *p.* 118, which act is also incorporated into the 2 *R. S.* 144, 5, 2*d ed.* as sections 35 to 41 inclusive, the associate judge took the same power to hold the common pleas as the first judge before had, and might equally with him, authenticate the records of the court.   By the 4th sec- tion, [§ 38, in 2 *R. S.*] he also took with the first judge ex- clusive chamber powers.   Then, by the 5th section, § 39, in 2 *R. S.* it is enacted as follows: " All the powers now vested in the said first judge *by virtue of the statutes of this state relative to any legal proceedings* are hereby giv- en, also, to the said associate judge."   It adds, that any pro- ceeding commenced by one, may in his absence be continu- ed &c. and perfected by the other.   The 6th section, § 40 in 2 *R. S.* confers upon him specifically the same powers as the first judge to preside in the courts of general sessions.   By the 7th section, the statute was limited to five years, which by the subsequent statute of April 1, 1839, *p.* 96, *of Sess. Laws* of that year, was repealed, and provision made for still an additional associate judge.   The former act of 1834, was expressly retained, except the limitation; and the new

judge is by § 2 invested with all the powers of the first judge. The object of the act of 1839, was first to render the act of 1834, perpetual. Then the act declares, in a separate section, that the additional judge, " shall possess all the powers *now vested by law*, in the said first judge of the said court," i. e. N. Y. common pleas.

Looking at the previous statutes, and taking the clauses conferring power on the associate judge, in the act of 1834, with their unrestricted import, there would seem to be no doubt that the associate judge took, among other powers, those of the first judge, in respect to the court of oyer and terminer. Such is the obvious sense of the clause which invests him with *all the powers of the first judge by virtue of the statutes of this state relative to any legal proceedings.* One of his statute powers was, to hold a court of oyer and terminer in conjunction with two aldermen. It would be singularly hypercritical to deny that this is a power relative to a *legal proceeding.* There is nothing in the words which, in their own import, confine them to *sole* statute powers in any legal proceeding, more than to a power exercisable in conjunction with others. The first judge had both. As a commissioner in certain cases, he might act alone, wherein it was seen to be useful that in case of his absence the proceeding should be continued and perfected before the associate; and so *vice versa.* The added clause, therefore, did well in providing for such a case ; and may be satisfied by being applied accordingly, without giving it the further effect contended for, as a restriction upon the general clause conferring on him all the statute powers of the first judge, without discrimination. These general words were also in themselves sufficiently broad to make the associate a judge of the general sessions, and, I think, rendered the sixth section unnecessary. I admit that this section is evidence that the legislature understood the general words as being possibly of narrower import than I have supposed, which, for more abundant caution, added the sixth section. And, if the act of 1839 were a mere extension of the powers of the associate judge under the act of 1834, to Judge Inglis, we migh be left in such doubt of his power as to call for a pardon, if not for a reversal of these proceedings ; and especially

The People v. White.

after learning, as we have, that practically, the act of 1834 has not been understood to confer the powers of a judge of the oyer and terminer on the associate then created. The act of 1839, however, beside retaining the act of 1834, goes on to declare in a separate section, (§ 2,) that another associate judge shall be appointed to possess all the powers *vested by law* in the first judge. No provisions for conferring specific powers occur in this latter statute. One of the powers spoken of as *vested by law*, was to hold with two aldermen, the court of oyer and terminer. That has been done in this instance, and we think rightfully.

It is equally clear, that over the court thus formed, Judge Edwards had a right to preside. By one of the sections already cited, it was made his general duty to preside at all the courts of oyer and terminer in his own circuit. By another, he had the same power in that or any other court of oyer and terminer, as a justice of the supreme court; and by another section, either of the circuit judges may preside for the whole or any part of the time during which any court of oyer and terminer continues.

Then, as to the point made by the prisoner's counsel, on the leaving of the bench by Judge Edwards, after the trial had progressed under his direction. It is true, that the business arrangements of the judges should be such as to secure a quorum for the whole trial; and we admit that judges of grade and number sufficient to constitute a legal tribunal, must begin and continue through with the trial. But that does not include supernumeraries. Any one judge of this court, who has heard the argument of a cause, may decide it, though the other judges were present when the argument began, and were called away before it closed. So should all three of the justices of this court, or three circuit judges, commence a criminal trial in the city of New-York, with two aldermen, together forming a court of oyer and terminer, and two of the justices in one case, or of the circuit judges in the other, might leave the bench in the course of the trial, without interrupting its progress; for a quorum would still remain, consisting of the same judges before whom the trial began. That is, in effect, the case at bar. Here judge Edwards and Judge Inglis, both and each, had

the same powers in respect to the oyer and terminer of the city of New-York, as two justices of this court or two circuit judges would have under the direct provisions of section 28, sub. 1. 2 *R. S.* 132, 2*d ed.* Judge Edwards had the general power to associate with and preside over the whole; but Judge Inglis, with the two aldermen, constitued of themselves a court having the same powers as if Judge Edwards had been joined with them, and heard and passed upon the whole matter. With the abstract fitness of the abdication complained of, we have nothing to do on this writ of certiorari.

As this case is important in itself, and any doubt, not to say mere silence, on the merits of any point made, might call for its review on an application for pardon, or perhaps on writ of error upon a record of judgment, or motion for a new trial, we have preferred to examine the objection founded on Judge Edwards' leaving the bench, though we think it not properly before us on the bill of exceptions. To present it properly now, it should at least have been made a part of the general record; short of that, we are inclined to think, it can be treated as no more than matter of irregularity examinable on motion in the court below. A special entry of the facts on the judgment record, after sentence, would present a different question.

There is nothing in the objection to the question, which *Timpson* was allowed to answer. It was insisted that what was said or done, after White left, was inadmissable. The question related to what the witness *saw.* Suppose he had seen Fitzpatrick dead of the wound inflicted by the prisoner, can it be doubted but that he might have stated the fact?

With regard to Wright's supposed deposition before the coroner, we must not be understood as conceding on the authority of the cases in respect to *memoranda* under the statute of frauds, *Merritt* v. *Clason,* 12 *Johns. R.* 102; 14 *id.* 484, *S. C. nom. Clason* v. *Bailey on Error,* that depositions may be drawn up with a pencil. But there are several other difficulties. We do not mean to say that any of these lie in the legal effect of the writing, though it is impossible to see that it conflicted with what Wright had said. But it is no way authenticated; and though the law pre-

sumes that the coroner reduced the testimony of the witnesses to writing, as in duty bound by the statute, 2 *R. S.* 622, *2d ed.* § 8, yet the same statute requires that the written testimony should be returned by him.   Here he has furnished nothing which can be recognized as an official return.   We have no *jurat ;* nor any thing importing that the witness was sworn.   The bill of exceptions says it purported to be the testimony of Wright; but sets it out with the inquisition, and all the marks of authenticity which it bore. It is headed *witnesses ;* and there is nothing beside to import that it was written by the coroner, or under his direction ; nor was it shown or offered to be shown that the *pencil writing* was in his hand.   Neither he, nor Wright, nor any other person, was sworn to show that this statement of Wright's testimony was correct.   We think the statute, in requiring the coroner to make a return of the testimony with the inquisition, cannot be satisfied short of some official certificate indicating that the witnesses named were sworn before him, to the matter insisted on as evidence. Testimony taken officially under this statute is, under circumstances, evidence against the prisoner;   1  *Phil. Ev.* 371, *7th Lond. Ed.;* and it would be most revolting to say that the life of a man should in any degree depend on such a loose pencil sketch, as this appears to have been.   At least, if there be no formal authentication, there should be proof *aliunde,* that the memorandum presents the testimony of the witness truly.   To contradict the witness, in a case where no testimony has been properly reduced to writing, oral evidence may be given of what he did say.   The alleged deposition was in a proceeding to which the prisoner was not a party.   It stood on the ground of an affidavit made in a proceeding between third persons.   In such case, to render it operative as impeaching testimony, the rule has been laid down, that you must do more than showing it purports on its face to have been sworn.   Proof *aliunde* must be given, that it was the witness' statement.   1  *Phil. Ev.* 379, *7th Lond. Ed.*

Next, as to the objection for variance between the indictment and proof.   The first count is for murder at the common law.   True, it interpolates the words of a particular

subdivision of the statute of murder, 2 *R. S.* 546, § 5, by averring that the stabbing was with a premeditated design to effect the death of Fitzpatrick. This addition did not vitiate the complete charge of murder at the common law, which the count contains independent of the allegation of premeditated design. You may reject this altogether, and still a murder remains completely charged in the technical language of the common law. The averment of premeditation is mere surplusage. The form of pleading is not altered by the statute ; and a common law indictment lets in the proof of any species of murder as defined by the section cited. All these were murders at the common law ; and the statute is declaratory. So the court below charged ; and the charge is entirely sustained by the good sense of *The People* v. *Enoch,* 13 *Wendell,* 159. It is the constant practice to reject the words " malice aforethought," in the common law indictment for murder ; and convict of manslaughter ; even a distinct species of homicide. Mr. Phillipps says, " it is an universal principle which runs through the whole of the criminal law, that it will be sufficient to prove so much of the indictment as charges the defendant with a substantive crime." 1 *Phil. Ev.* 202, *7th Lond. ed.* In *Mackalley's case,* 9 *Rep.* 67, *b.* 1 *Plowd.* 98, the murder was charged to have been committed in resisting a sergeant at mace, who had a precept. The evidence was that he had no precept but made the arrest *ex officio ;* and held no variance, for the precept was but a circumstance. Phillipps says, that in an indictment for murder, the malice is but a circumstance in aggravation. Hence you may reject it, and prove a manslaughter. 1 *Phil.* 203, *ed. before cited.* On a charge of petit treason, the prisoner may be found guilty of murder. *Swan & Jeffery's case, Foster's Cr. Law,* 104. An indictment for killing with a dagger is sustained by proof of killing with a staff. 9 *Rep.* 67, *a. Rex* v. *Clark,* 1 *Brod. & Bing.* 473. On an indictment for robbery, the prisoner may be convicted of simple larceny. 2 *East, P. C.* 513, 515, 16 ; and on an indictment for burglary and stealing, he may be convicted of the latter only. *Id.* 513. In all these case it might have been said, with the same propriety as in the case at bar,

The People v. White.

that the crime was set out with the addition of false circumstances entering into its description, or identity. Yet such circumstances were rejected, as not necessary to be proved. The substance of the issue was proved without them; and nothing more is necessary. Admit then that the allegation of premeditation was false as indicating express malice; admit that it was a circumstance in aggravation, yet it may be dismissed and implied malice be substituted.

Mr. Chitty, after giving many instances in which the jury may divide the count, by finding only a part of it to be true, if that part constitute a complete offence, and rejecting the residue, adds : " the only exception to this rule seems to be, where the prisoner, being originally indicted for a different offence, would be deprived of any advantage which he would otherwise be entitled to claim. Thus he cannot be indicted for a felony, and found guilty of a misdemeanor;" but the reason given is, that he would thus, among other things, be deprived of a copy of the indictment, and the right of having counsel. *Vid.* 1 *Chit. Cr. Law,* 637, 8, 9. Even this is an objection which, under our system, would be entirely inapplicable. Clear as the doctrine is on English authority, it seems to be still clearer, therefore, with us. It fully sustains the charge of the court below. The first count was substantially satisfied by proof of any offence which is made murder by the statute.

The remark of the judge, that a doubtful case should be turned in favor of a prisoner by proof of good character or a virtuous life, but that the present case wanted both, was strictly true ; and a similar remark was sanctioned by this court as proper in *The People* v. *Vane,* 12 *Wendell,* 78. I once made a like remark, adding that probably the prisoner could not make out a good character, inferring this from his admission in conversation, that he had before been in the state prison. This court held that I had improperly let in the admission and the remark by me, in connection with the admission, was assigned as one reason why the judgment should be reversed. *The People* v. *White,* 14 *Wendell,* 111. That is going far enough.

The case at bar, is but the common one of a judge pointing out to the jury a weak point in the prisoner's defence. It was merely saying " the defence is not so strong as if he had shown a good character ;" unless the farther objection be available, that the expression was equivalent to telling the jury that though they should hold the case to be doubtful, yet good character was necessary to turn the scale in his favor. That would have been wrong. The whole charge is not before us, and we must therefore intend that the judge charged the direct contrary, viz: that reasonable doubt would alone entitle the prisoner to a verdict of acquittal. Saying so, we cannot hold it a fatal error to add that good character should clear all doubt in this connection. The two remarks taken together could not mislead the jury. It might, I admit, be otherwise, had it appeared in the bill that the judge withheld the usual caution in respect to reasonable doubt.

On the whole, we are clear against all the exceptions; and the law must take its course. Our order is, that the record be remitted, with directions that the court below pass sentence on the prisoner, at the next court of oyer and terminer in the city of New-York.