# THIRD DEPARTMENT.

## GENERAL TERM, DECEMBER, 1874.

---

## SHAW v. PEOPLE.

*Criminal evidence — statements in articulo mortis — opinions — declarations — hearsay — what is not hearsay — Trial — objections — Court of oyer and terminer — constitution of.*

Upon a trial for murder by poisoning, statements made by one of the murdered persons in *articulo mortis*, in one instance, that defendant and one B. were the cause of all her sufferings; and in another instance, in answer to an inquiry as to the cause, that she expected it was Charles (referring to defendant) and B. *Held* inadmissible; the former being the expression of an opinion, and the latter of a mere suspicion.

The defendant objected, etc., to certain questions to which the answers were responsive. *Held* sufficient to entitle defendant to raise the points involved in the admission of the answers and have the erroneous rulings reviewed.

One of the defenses at the trial was that the poison was administered by the prisoner's wife, who was also poisoned. *Held*, that a threat made by the wife several days prior to the illness from the poison of herself and children (the other persons poisoned), "That she had poison and knew how to use it, and rather than B. should have her children she would put them all under the sod," was admissible. Under the theory of the defense, all of the acts and declarations of the accused and deceased tending to throw light upon the cause of the death or upon the criminal relations of either of them with the proximate cause, were proper. *Held*, also, that the evidence was original and independent and not hearsay.

Hearsay evidence is such as does not derive its value solely from the credit to be given to the witness himself, but rests in part on the veracity and competency of some other person. Under this rule, a narrative of a past transaction would be excluded, but where the question to be ascertained simply is whether the declaration was made, and not whether it was true, the fact testified to depends solely upon the credibility of the witness, and is, therefore, strictly and properly original evidence.

A court of oyer and terminer, at the trial of an indictment for murder, was held by a justice of the Supreme Court, a county judge and two justices of the sessions. During the pendency of the trial, one of the justices of the sessions

was absent for a day, then returned and without having read the evidence given during his absence, or it being again given, took part in the subsequent deliberations of the court at the trial.   *Held*, per HARDIN, J., (1) that after such return the cou₁t was illegally constituted; and (2) that the error was one which the prisoner could not waive.

ERROR to the court of oyer and terminer of Washington county, to review the conviction of Charles Shaw.

The plaintiff in error was indicted at the February term of the oyer and terminer for 1873, for the murder of his wife, Julia Ann Shaw, by poisoning with corrosive sublimate; and Sarah Briggs was jointly indicted with him, as accessory before the fact. At the same term three other indictments were found against the plaintiff in error as principal, and Sarah Briggs as accessory for the murder by poisoning with corrosive sublimate, of Elizabeth Shaw, Mariette Shaw and Harriet Shaw, respectively, who were the children of the plaintiff in error and Julia Ann Shaw. The plaintiff in error was tried at the October term, 1873. It was the theory of the prosecution on the trial, that the deaths of Julia Ann Shaw and the three children were all caused by corrosive sublimate, mixed in whisky, and administered to them by the prisoner at the same time, on the 13th day of January, 1873, and on various occasions thereafter during their illness until his arrest. Elizabeth, Marriette and Harriet died in January, and Julia Ann, the mother, on February 5th, 1873. The alleged motive to the crime was that the prisoner had become enamoured with Sarah Briggs, and desired to be rid of his wife that he might form closer permanent relations with her. The theory of the defense was, that the sickness and deaths of the mother and children were caused by improper food innocently taken, sausages in a state of chemical change, eliminating what is described as "sausage poison"—the same food making others also seriously ill; or, if the deaths were the results of criminal agency, that the poison was in fact administered by the wife and mother herself, Julia Ann Shaw, in a fit of jealousy, caused by her suspicions of improper intimacy between the prisoner and Sarah Briggs. The prosecution accordingly proved under the prisoner's objections and exceptions the entire transactions, including the acts of the prisoner toward the children, so far as his wife was connected therewith, and the alleged effects produced upon the children as well as the wife, by the potions administered to them, including the post-mortem examinations and chemical analyses of their remains. They

also proved acts of intimacy between the prisoner and Sarah Briggs, declarations and threats of the prisoner made previous to the illness of any of the members of his family indicative of an intention to part with, or to remove his wife out of the way as an obstruction to the gratification of his desires. They also offered in evidence the declarations of the wife as to the cause of her sufferings, made during her illness, and after she had abandoned hope of recovery. The prisoner's counsel objected to the evidence as hearsay, incompetent and inadmissible, and that no proof had been made to bring them within the rule of dying declarations. The court overruled the objections and the prisoner excepted. One of the witnesses then testified to the following declarations: "She said that Charles and the Briggs woman was the cause of all this suffering, the cause of all this. * * * She remarked once that Charles and the Briggs woman knew all about this — something to that effect." Another witness was permitted to testify under the same objection and exception as follows : " I talked with Mrs. Shaw only once about the cause of her sickness ; she said she expected it was Charles and Mrs. Briggs." The prisoner's counsel offered to prove in his defense, the declarations of his wife a few days before her illness, while talking in an excited manner about her husband and Sarah Briggs, " that she (the wife) had poison, and knew how to use it ; and that rather than Mrs. Briggs should have her children, she would put them all under the sod ;" and also, " that rather than Mrs. Briggs should be stepmother to her children, she would put them under the sod." The counsel for the people objected to this evidence as immaterial, irrelevant and hearsay. The court sustained the objection and rejected the evidence, and the prisoner's counsel excepted. Various other objections were made, and exceptions taken during the trial by the prisoner's counsel, to the reception and exclusion of evidence. The jury found the prisoner guilty of murder in the first degree.

*Charles Hughes* and *D. M. Westfall,* for plaintiff in error.

*M. D. Grover* and *James Gibson,* for people.

COUNTRYMAN, J. The declarations of the deceased, received in evidence, were shown to have been made *in extremis* within the rule rendering them admissible as dying declarations. But in two instances they were, nevertheless, erroneously received, for the

reason that the declarations were not narratives of facts, but were conclusions or conjectures of the deceased as to the cause of her illness. In one instance the declaration was that the defendant and Mrs. Briggs were the *cause* of all her sufferings, and in the other in answer to an inquiry of the cause, that she *expected* it was Charles (referring to the defendant) and Mrs. Briggs. No facts were stated to the witnesses testifying to these declarations, directly or indirectly connecting the defendant with her misfortune, or from which an inference could be drawn by the court or jury concerning his connection with the alleged crime ; but the declaration in one instance was a bare assertion of her opinion that he was the cause, and in the other, a mere expression of her suspicion to the same effect. Neither of these statements would have been competent evidence, if the deceased had been alive and examined as a witness under oath, and they were, therefore, equally inadmissible as dying declarations. 1 Greenl. Ev. § 159 ; Roscoe's Crim. Ev. 28 (Marginal); Whart. Crim. Law, § 678.

The limitations of the rule allowing the reception of this kind of evidence, should be strictly observed. It is even more important to exclude an opinion given *in articulo mortis* than in an ordinary case, where the witness may be subjected to a cross-examination. In the latter case the grounds of the opinion may be ascertained, and if unfounded or untenable, the error exposed, while in the former there is no opportunity or means of testing its accuracy. The bare assertion and reiteration of an inference or conclusion, which may have been honestly, but mistakenly, entertained, and may have been founded on mere suspicion or conjecture, were, in this case, committed to the consideration of the jury as equivalent to positive statements of the fact, made on the personal knowledge of the declarant. The evidence was clearly incompetent, and may have had a material influence on the verdict. It would be exceedingly hazardous at least, to assume that it did not, or to speculate upon the probable weight attached to it, in the deliberations of the jury.

It is urged that the defendant is not in a position to avail himself of these errors, as the objections and rulings were made, and exceptions taken to the questions which it is claimed were proper in form, and not to the answers of the witnesses ; and it is insisted, that if the answers, or any portions of them, were improper, it was incumbent on the defendant to have moved to

strike them out, and thus have raised the points as to their incompetency. This criticism, if technically correct, should hardly be entertained in a capital case, but it is not well founded in fact. The questions called for the conversations of the deceased "about the cause of her sickness or condition," to which the defendant objected as "incompetent and inadmissible" among other grounds, and the answers were directly responsive to the questions. The defendant is, therefore, entitled to raise the points, and review these erroneous rulings.

It was also an error to exclude the declarations or threats of the deceased, made several days prior to the illness of herself and children, that she had poison and knew how to use it; and that rather than Mrs. Briggs should have her children, she would put them all under the sod. It is insisted for the prosecution, that these declarations were no part of the *res gestæ,* and are strictly within the rule excluding hearsay evidence. The case has many remarkable features. It was the theory of the prosecution that the deceased and four of her children were poisoned at one time, and in the same manner, three of the children and the mother dying from its effects, while the other child finally recovered. Evidence was therefore given of the acts of the accused toward the children as well as the wife, and the effects produced on all of them, by the potions which were administered, including the *post-mortem* examinations and chemical analyses of their remains. The dying declarations of the wife were received, some of them according to the testimony, directly tending to inculpate the accused, as the person who administered the poison, and others delivered later to the coroner, completely exonerating him from all criminal responsibility. It was also proven, that the defendant had repeatedly threatened the life of his wife prior to her illness, and made other declarations, indicative of personal hostility and evil designs;—and as a motive to the crime, evidence was received tending to show the existence of illicit relations between the defendant and Sarah Briggs. On the other hand upon the assumption that the deaths were the results of criminal agencies, it was the theory of the defense, that all the poison was administered by the wife and mother herself, under the exasperating influences if not an actual delirium of jealousy.

The issue, therefore, on this branch of the case was direct and clear, that the poison was administered either by the accused or the deceased, the prosecution endeavoring to prove the former, and the

defense the latter theory.   It is true the defendant also contended
that the deaths had ensued from innocent causes, as the reception
of deleterious food into the system, which had, in the process of
chemical change, generated the poison.   But in the event the jury
were satisfied that criminal means had been employed, it was equally
important and indispensable to the accused, to show, if he could,
that he was not the criminal.   How could he do so more effectually,
than by proving that the real criminal was the deceased herself ?
All of the acts and declarations of the accused and the deceased,
tending to throw light upon the cause of death, or upon any crim-
inal relations of either of them with the proximate cause, were
accordingly proper and original evidence ; the acts and declar-
ations of the accused, in favor of the prosecution, to prove his
alleged guilt, and the acts and declarations of the deceased, in
favor of the defense, to sustain the theory of suicide.   The prose-
cution were properly permitted, in support of their theory, to give
in evidence the threats of the accused against the life of the
deceased ; but it was equally proper and essential to the rights of
the accused, that he should have been allowed to prove the threats
of the deceased against her own life, and the lives of her children.
This was the best evidence, in the nature of things, that could be
produced.   Indeed it was the only evidence, and, therefore, admis-
sible from necessity.   There is no difficulty with this question on
principle or the rules of evidence.   It is not necessary to regard
these threats as a portion of, or as characterizing the principal
transaction, and therefore admissible as a part of the *res gestœ,*
although the rule limiting this class of evidence merely to contem-
poraneous acts and declarations is properly undergoing some modi-
fication.   *Insurance Company* v. *Mosley,* 8 Wall. 397 ; *Hanover
R. R. Co.* v. *Coyle,* 55 Penn. 402 ; *Rawson* v. *Haigh,* 2 Bing. 99 ;
*Commonwealth* v. *M'Pike,* 3 Cush. 181.

But it was original evidence, as distinguished from hearsay.
The term "hearsay," in its legal sense, as defined by the element-
ary writers, denotes that kind of evidence which does not derive
its value solely from the credit to be given to the witness
himself, but rests also in part on the veracity and competency
of some other person.   1 Greenl. Ev., § 99 ; 1 Phill. Ev. 185.
The narrative given of a past transaction by the deceased, before
she was under apprehension of death, as testified to by a witness
who heard it, would clearly fall within the rule of hearsay, because

in determining the material question, whether the narrative was true, it would be necessary to consider the credibility of the witness, and the veracity of the declarant. But the declarations of third persons not under oath do not always relate to past transactions, and are not, therefore, necessarily hearsay. Very often the material fact to be ascertained from the evidence simply is, whether the alleged threat or declaration was made, and not whether as a statement or narrative, it was really true. In such a case, the mere fact, whether the declaration was made, depends solely on the credibility of the witness who testifies that he heard it, and such testimony is, therefore, strictly and properly original evidence. Now it was a material fact under the issues in this case, whether the deceased had ever threatened to resort to poison for the purpose of self-destruction, or the destruction of her children. It was, if true, an independent fact of more or less importance, according to the circumstances, although it did not follow that she had actually carried the threat into execution. Her threat to commit suicide (whether in direct terms or by implication, would only affect the weight of the evidence) was as competent and material for the defense, as were the threats of the accused against her life, for the prosecution. The utterance of the threat is received in evidence as a fact or circumstance indicating an intention on the part of the person making it, to commit the crime, and if the intention be clearly shown, a probability is thereby created that upon a favorable opportunity it would be carried into effect. But this result or probability is wholly a matter of inference for the court or jury in determining the weight to be given to the fact, that the threat was made, in connection with the other evidence in the case. Until the fact is established, there is no ground for the inference, and the proof of the fact depends exclusively on the amount of credit to be given to the witness.

This precise question does not seem, heretofore, to have been the subject of judicial investigation in this State. The rule, however, above stated was recognized, and similar declarations admitted by a very eminent authority on evidence from his great learning and experience as a *nisi prius* magistrate — the late Judge EDMONDS, in the case of *People* v. *Knapp*, 1 Edmonds' Select Cases, 177. Similar declarations were also held admissible, and the general doctrine considered and approved by the Court of Appeals in the recent case of *Stokes* v. *People*, 53 N. Y. 164, 174. And in other States,

whenever the question has been judicially examined, the same general conclusion has been adopted. *State* v. *Goodrich*, 19 Vt. 116; *Keener* v. *State*, 18 Ga. 194, 224–228; *Commonwealth* v. *Wilson*, 1 Gray, 337; *Campbell* v. *People*, 16 Ill. 17; *Cornelius* v. *Commonwealth*, 15 B. Monr. 539.

For these errors, the conviction and judgment must be reversed and a new trial granted.

HARDIN, J. "Courts of oyer and terminer shall be composed of a justice of the Supreme Court, *who shall preside*, and the county judge, and the justices of the peace designated as members of the court of sessions; and the presiding justice, and any two of the other officers above mentioned, shall have *power* to hold said courts." Laws 1847, chap. 280, § 38. Under this provision the court was properly organized, when the trial was commenced before a circuit judge, the county judge of Washington county, and the two justices of the peace, designated as justices of the sessions of said county. Several days were devoted to the taking of evidence, and an adjournment over Sunday had, before a court regularly and properly constituted. When the court re-assembled Justice Steere was absent, and the court proceeded, composed of one justice of the peace, the county judge, and the circuit judge. The evidence taken on Monday and during the absence of Justice Steere was taken before a court composed of three of the officers named in the statute having "power to hold said court." If the trial had continued to its close before the court thus constituted, it may be conceded that it would have been regular and no error could have been predicated upon the absence of Justice Steere.

But on Tuesday morning after his absence from the court on Monday, and without having heard the evidence given during Monday, and without having read the evidence thus given during his absence, and without the evidence being again given, Justice Steere returned to the court room, resumed his seat upon the bench, joined the court and took part in its deliberations, and all the subsequent parts of the trial.

Whenever an objection was made by the prisoner's counsel to evidence, and it became necessary for the court to deliberate upon the proper ruling, Justice Steere took part, it must be assumed, and his voice and vote were as potential in affecting the rights of the prisoner, as well as the interests of the prosecution, as the vote

of the other justice of sessions, the county judge, or even the circuit judge. The latter three had heard all the evidence given upon the trial, and therefore could intelligently and understandingly pass upon the question involved in the deliberation. Certainly their understanding and intellects were better prepared by reason of having heard the whole evidence, than was Steere's, who had not heard the evidence taken on Monday, when he was absent from the court-house. His voice and vote upon any question arising upon the trial, after his return, may have produced a different result from what they would had he remained during the whole trial, heard the whole evidence, and given his reflective judgment to it, preparatory to voting and speaking in the deliberations which ensued after his return to the bench he had, so far as the parts of the trial which took place on Monday, vacated and abandoned.

It is not for us to speculate, in a case where the life of a prisoner is involved, as to the extent of the influence of the vote and voice of one who has not heard the whole evidence. The prisoner is entitled to the full benefit of the understanding and judgment of those who take part in the judicial deliberations which affect his life. He is entitled to all the forms of law; to all the provisions of the constitution by which his rights are secured.

Where life is involved the law humanely provides that the prisoner stands upon all his rights, and does not, and *cannot* waive them. *People* v. *McKay*, 18 Johns. 212 ; *Cancemi* v. *People*, 18 N. Y. 128 ; *Arundell's Case*, 6 Coke, 28 ; *People* v. *White*, 22 Wend. 167; S. C., 24 id. 520; *Safford* v. *People*, 1 Park. 474 ; *Shepherd* v. *People*, 25 N. Y. 406 ; *Blend* v. *People*, 41 id. 606 ; *Messner* v. v. *People*, 45 id. 1; *Stokes* v. *People*, 53 id. 164 ; *Dohring* v. *People*, 2 N. Y. Sup. 458.

The learned counsel for the people insist that no error was committed by reason of the absence, during a portion of the trial, of Justice Steere. But we cannot say that no injury was done to the rights of the prisoner, for it manifestly appears that it may have done him some injury. *Shorter* v. *People*, 2 N. Y. 193; *Willis* v. *People*, 5 Park. 647 ; *People* v. *Gonzalez*, 35 N. Y. 49 ; *Fralich* v. *People*, 65 Barb. 48; *Stokes* v. *People*, 53 N. Y. 164.

It is provided by statute that no judge shall decide " or take part in the decision of any question which shall have been argued in the court when he was not present, and sitting therein as a judge." 2 Rev. Stat. 275, § 2. Though the technical language of that section

may not apply here, yet the same reason exists for holding that Steere should not take part in the decisions necessary to be made, after his return to the trial, as apply under the statute above cited to prevent a judge from deciding where he has not heard the argument.

We are referred to *Corning* v. *Slosson,* 16 N. Y. 294, by the learned counsel for the people, where it was held that three judges might hold a general term and render a decision where only two of them had heard the argument of the cause. In that case two constituted a majority of the court, and it was assumed that in the decision they concurred, and that they had conferred with their associate who heard the argument but did not sit, when the decision was handed down, and that the judge who had not heard the argument and did sit, to constitute a quorum, when the decision was handed down took no part in the decision.

Here it must be assumed that Justice Steere participated in the trial which resulted in the prisoner's conviction and sentence to death ; that at one stage of the trial, to wit, when the sentence was pronounced, he was essential to constitute a quorum.

It was held in the case of *Messner* v. *People, supra,* that asking the prisoner what he had to say why the sentence of the court should not be pronounced, was part of the trial, and that its omission was error and such error as called for a reversal and a new trial, and that the court could not say that a regular and legal trial had been had, and under the amendment of 1863 (chap. 226), remit the record for the proper sentence and judgment.

Also in *People* v. *Lake,* 12 N. Y. 362, it was held to be error in a court of oyer and terminer to permit physicians, who did not hear all the evidence relating to the mental condition of the prisoner, to give opinions as to her sanity, founded on the portions of the evidence heard by them. By parity of reasoning it may be said to be erroneous for a member of the court to take part in the deliberations, consultations and rulings when he has not heard the whole evidence given upon the trial. *McCann* v. *People,* 3 Park. 272.

The participation of Justice Steere in the trial, after his absence from the court-house while the whole of Monday's evidence was being given, was against the provisions of the law and constitution giving a jury trial before a regularly constituted court, the members of which should hear all the evidence and proceedings.

It certainly is against public policy to allow a party to be deprived

of his life by a tribunal of which it can be said that a portion thereof has not heard the whole evidence and proceedings which result in the sentence of death.

These views, as well as those expressed in the elaborate and able opinion of brother COUNTRYMAN, lead me to vote for a reversal of the conviction.

BOCKES, J., concurred with the views set forth in the opinion of COUNTRYMAN, J., but expressed no opinion as to the question discussed in the opinion of HARDIN, J.

*Judgment reversed and new trial ordered.*