## JOHN ROACH *v.* THE STATE.

1. MURDER. — By art. 606 of the Penal Code, all murder committed by the specified means of poison, starving, or torture, or committed in the perpetration or in the attempt at the perpetration of arson, rape, robbery, or burglary, is made murder in the first degree. If an indictment charges a murder to have been so committed, the evidence and the instructions to the jury must be confined to the case thus specifically made by the indict-

nent. The rulings to this effect in *Tooney* v. *The State*, 5 Texas Ct. App. 163, approved.

2. SAME. — Nevertheless, on the trial of an indictment in the common form for murder, the State may, as evidence of the malice aforethought, prove that the homicide was committed by poison, starving, or torture, or that the defendant's motive in perpetrating it was to commit arson, rape, robbery, or burglary: and the instructions to the jury should be commensurate with the case made by the indictment and the facts in proof.

3. SAME — CHARGE OF THE COURT. — In the trial of an indictment which in customary form charged a murder upon express malice aforethought, the evidence tended to prove that robbery was the motive which actuated the perpetrator. The court below gave in charge to the jury the general definition of murder and of "express malice," and also instructed them that all murder committed in the perpetration or in the attempted perpetration of robbery is murder in the first degree. *Held*, correct. Note the distinctions between this case and *Tooney* v. *The State*, 5 Texas Ct. App. 163.

4. ACCOMPLICE TESTIMONY. — To allow a conviction to stand upon testimony of an accomplice not corroborated by any other evidence tending to connect the defendant with the offence committed, would be in direct violation both of the letter and the spirit of art. 741, Revised Code of Criminal Procedure. The requirement of the law in this respect cannot be satisfied with any degree of credence accorded to the accomplice by the jury, nor by any amount of corroborative evidence which does not tend to connect the defendant with the offence committed. Note in the present case evidence held insufficient for such purpose.

APPEAL from the District Court of Clay. Tried below before the Hon. J. A. CARROLL.

The indictment charged the appellant and one Emsley Harris with the murder of Robert Dickey, on December 17, 1875, by shooting him with a pistol. The jury found the appellant guilty of murder in the first degree, and assessed his punishment at the penitentiary for life. There had been a previous conviction of the appellant, and an appeal therefrom, resulting in a reversal and new trial, on grounds disclosed in the report of the case in 4 Texas Ct. App. 46. A statement of the evidence was not given in that report, but seems requisite now.

Emsley Harris " turned State's evidence," and was the principal witness for the prosecution, in so far as the incul-

pation of the appellant was concerned, — the *corpus delicti* being proved beyond cavil, and by other testimony as well as his. He, at the instance of the defendant, had but a short time prior to the murder come to Clay County from Lamar, along with the deceased, the defendant, and their wives. The defendant was a nephew of the wife of the deceased, who, on the day of his death, had moved to a place he had just purchased in Clay County.

Harris testified that he rode a horse of his own on their trip to Clay County, and on the route swapped his saddle for a cap-and-ball six-shooter pistol. When the party reached the Boren Springs, about fifteen miles from Henrietta, in Clay County, the defendant proposed to kill Dickey, saying that he would steal out and hide one of Dickey's mules, and when Dickey went to hunt it, he would kill him. Witness told the defendant he had better not, as Dickey might see him take the mule, and would shoot him. Again, while they were stopping at another place, and when the deceased had told witness to go in search of the mules, the defendant told witness to run them off when he found them, and that when old Dickey went to hunt them, he (the defendant) would go along with him, kill him, and get his money. Witness failed to find the mules, and Dickey sent him and the defendant to look for them the next day. When they found them the defendant proposed to run them off, saying that when Dickey should go in search of them he would kill him ; but just as the defendant was starting them off, a man came along, and the defendant told him there was another mule missing, and talked to the man about an hour. In the meantime the mules went off, and defendant sent witness in one direction to seek them, and went another direction himself, telling witness to run them off if he found them. Witness found the mules and drove them home, and the defendant, when he came in, asked witness why he did not run them off, so that he (defendant) could kill Dickey. Witness replied that the man they met would know all

about it.   A day or two afterwards, Dickey and the defend-
ant went to buy a place, taking their guns with them.
Witness cleaned up his pistol, and practised with it a little,
shooting at a post.   The next day they moved to the place
Dickey bought, reached there in the middle of the after-
noon and unloaded the wagons.   Witness and defendant
then moved the man from whom the place was purchased ;
they took him to Wichita City, got back a little before sun-
set, bringing with them a load of wood, ungeared the mules
and turned them out to grass, and then sat down and eat
supper.   Witness finished supper first, and went to the crib
to feed the horses.   While he was feeding his own horse,
the defendant came from towards the house with some corn
in his arms.   From the house the crib was about fifty yards
a little southwest, and the spring about three hundred
and fifty or four hundred northwest.   In a short time
Dickey came along with two buckets and a spade, and
said he was going to the spring, and asked witness to
go with him, saying that the defendant could chop
some wood and feed and curry the mules.   Defendant
spoke up and said that he would go with Dickey to the
spring.   They went off, leaving witness at the crib, and not
long afterwards he heard a shot in the direction of the spring.
In a little while the defendant came, with a bucket of water
in each hand, and said he had killed old Dickey.   Witness
replied, " I reckon not ;" and defendant said yes, he had,
and pulled out the pocket-book and said there was the
money.   Witness felt of the pocket-book, and it felt like
Dickey's, but it was too dark to see its color.   Witness
told the defendant that if he did not want the women to
know it, he had better take the water back.   He carried the
water back, witness waiting until he returned, when he told
witness where he had hid the pocket-book under the straw-
pen, and asked witness for some ammunition to load the
pistol.   Witness replied that he only had powder and balls,
and no caps ; and they then loaded the pistol.   Defendant

then went to the house, saying he would go there and ask for the tie-ropes, and thus make the women believe he had been about the horses all the time. Witness did not remember whether the defendant got the tie-ropes or not, but he and the defendant soon went into the house; witness carried the pistol in and put it under the head of the bed, and noticed the scabbard and belt lying on the wall-plate, where he had laid the pistol when they returned in the evening with the load of wood. He did not know how or when the pistol was taken from there by the defendant, nor remember whether it was shown to him by the defendant when he brought the buckets from the spring, or after he returned from taking them back. After getting into the house they began cutting up some fuse they had got from the man whom they had moved to Wichita City, and were burning it to amuse the children, when Mrs. Dickey requested the defendant to go to the spring and bring some water, and to see what had become of his uncle Bob, the deceased. Defendant paid no attention to her for some ten or fifteen minutes, when she again made the same request. Defendant then pulled on one of his boots, and said he wanted a drink anyhow before he lay down. Then some parties passing the house were heard talking, and the defendant said, " There comes Uncle Bob, now." The parties then went on, and then Mrs. Dickey again requested the defendant to go to the spring, and he got up and started. He asked the witness to go with him, and they went together until they got about seventy-five yards from the spring, when the defendant said, " Let us stop here long enough for us to get to the spring, and then run back and tell Mrs. Dickey that Mr. Dickey or some one else was down there close to the spring, dead;" and asked if witness could tell it like he was scared. Witness replied that he thought he could; and when they had stayed there long enough they ran back to the house. Witness went in front, and told them at the house that old man Dickey or some one else was dead

down there by the spring.    Mrs. Dickey jumped up scream-
ing, and said, "We will go down there."   Defendant
said he was afraid, and she told him to get his gun, which
he did, and he and his wife, Mrs. Dickey and the children,
and witness, all went, and found Mr. Dickey dead, lying on
his back, with his hands folded across his breast.    Mrs.
Dickey gathered him in her arms, screaming, and the defend-
ant and his wife went back to the house after the wagon,
got it, and the body was hauled to the house.    Just before
getting to the house, two strange men came up, and one of
them asked what all this meant.    The defendant replied that
a man was killed, and Mrs. Dickey said, "My husband, —
killed and robbed."    The man asked how she knew her
husband was robbed, and she replied, "I have felt his
pockets."

   "The next day," said the witness, "they held an inquest,
and I was sworn and examined as a witness, and did not
swear what I have told here.    I told the magistrate I knew
nothing about the murder, — just what the defendant told
me to tell.    What I swore then was false; what I am now
telling is the truth.    Soon after this the defendant and I
were arrested, tried before an examining court, and com-
mitted to jail.    In a short time after that — about two days,
I believe — Mrs. Dickey was put in jail.    While the inquest
was being held there were several persons hunting around
the hay-stack for the money, and I asked the defendant
where it was.    He said never mind; he had put it where it
could not be found.    I do not know where the money went
to, or what became of it."

   Witness further stated that when the officers came to hold
the inquest, they found the pistol under the head of the
bed, where he had put it.    He did not conclude to tell what
he knew until six or eight months after he was put in
jail.    A good many persons came to the jail and asked him
to turn State's evidence.    The county attorney came, and
promised to dismiss his case and set him free if he would

tell.   He first told the facts to an old friend from Lamar County, and then to the sheriff and county attorney, who said he should go free if he would testify.

Mrs. M. A. Dickey, widow of the deceased, testified for the State.   She said that her husband and family left Lamar to move to Clay County about three weeks before he was killed.   The defendant and his family, and Emsley Harris, moved with them.   The deceased and the defendant each had a shot-gun, and these were the only arms she knew of in the party until they got within some twenty-five miles of Henrietta, the county-site of Clay County, when she learned of a pistol belonging to Emsley Harris.   After stopping about a week at Cambridge in Clay County, they moved about eight miles in the country, to a place for which her husband had traded the previous day, and he was killed in the night of the day they got there.   He and the defendant, taking their guns with them, had gone to look for a place the day before, and Harris sat in the house cleaning up his pistol, and she made him get out of the house with it, and heard him shooting it around.   It was about the middle of the afternoon when they reached the place to which they moved, and the defendant and Harris, after unloading the wagons, moved a Mr. Nivins to Wichita City, about a mile and a half distant, and brought back with them a wagon-load of wood.   They got back about sunset, and supper was then about ready.   Witness and her husband, the defendant and his wife, and Emsley Harris, all eat supper at the same time.   After supper the deceased went into the main room, lit his pipe, and commenced smoking ; and the defendant and Harris went out to the crib to feed the horses.   In a short time the deceased took two buckets and the spade, and said he would go to the spring, clean it out, and bring back some water, while the boys (Harris and the defendant) fed and curried the horses and chopped some wood.   In a little while Harris came back in the house, got and eat some molasses, and went out again.   The defendant came to the

door and asked witness for the tie-ropes to tie the horses, and witness told him the ropes were lying on the ground near the door. Witness saw no more of him or Harris until about dark, when they came into the house together. Defendant had some fuse, which he said he had got from the man they had moved to Wichita City, and he and Harris cut it up and amused the children by burning it, for fifteen or twenty minutes. Witness told the defendant he had better go and see what had become of his uncle Bob, the deceased. Defendant paid no attention to witness, but continued to play with the children for some ten minutes more, when she renewed her request, and he then pulled on one boot, and said he wanted a drink of water before he lay down. Some persons came along near the house from the direction of the spring, and the defendant remarked, "There comes Uncle Bob now." They passed on toward Wichita City, and witness again asked the defendant to go for some water and see what had become of his uncle Bob. He got up and started, and asked Harris to go with him. Harris went along with him, and in a little while they came running back, and Harris, who was in front, told witness that Mr. Dickey or some other man was lying down there at the spring, dead. Witness arose, screaming, and, telling defendant to get a light, gathered the children and said, "Let us go down there to him." Defendant said he was afraid, and she told him to get his gun, and he did so, and they all went down together, Harris carrying the light, and witness walking in front. When they got to her husband's body, she took hold of his head and felt inside of his collar, and found that he was dead, but still warm. Witness remarked that he had been stabbed, there being a mark under his left eye which looked like the mark of a dirk or dagger. She screamed for help and for her neighbors, and one of the party proposed that the wagon should be brought to take the body to the house. Defendant and his wife went to the house and got the wagon, and Harris stayed with the wit-

ness at the body, keeping the gun with him. Having lifted the body into the wagon, and got near the house with it, two strange men approached and asked what was the matter. Witness replied, " My husband, — murdered and robbed." The men said, " How do you know he is robbed? " and she answered that she had felt in his pockets, and his pocket-book was gone.

Witness had known the defendant ever since he was a child; he was her brother's son; had married a girl who had been raised by her husband, and ever since his marriage had lived with witness and her family. While he was growing up he had been at her house very often, and sometimes stayed there two or three weeks at a time. No hard feelings between him and her husband had ever existed, so far as she knew; on the contrary, they were on the best of terms. She never saw defendant handle Harris's pistol, nor have a pistol of his own.

The witness stated that she had herself been indicted for the murder of her husband, the deceased, but had been tried and acquitted. She thought that her husband, when killed, must have had $400 or $450 left, out of $700 or $800 with which he left Lamar County. She never knew him to keep his money elsewhere than in a little leather pocket-book which he carried in his pocket.

Witness had known Emsley Harris ever since he was a little boy, but knew no reason why he came with them to Clay County except that the defendant said that he had hired him. Defendant's only live-stock was a horse, and witness could not say what he wanted or had hired Harris for. When the defendant and Harris started to go to the spring, they were gone but a short time; witness did not think it was long enough for them to have gone to the dead body. She said she did not know who killed her husband.

W. H. Miller, testifying for the State, stated that he was the person who, just as the body was taken to the house,

came up and asked what was the matter, eliciting from defendant the reply that a man was killed, and from Mrs. Dickey the response, "My husband, — murdered and robbed." Witness asked how she knew, and she said she had felt in her husband's pockets. Witness inquired how he was killed, and the defendant answered that he was shot. This was about ten o'clock in the night.

V. K. Edgar, the magistrate who held the inquest, testified that the deceased was shot in the back of the neck, and that the ball ranged upwards and came out just below the left eye. His coat-collar was powder-burned. The place at which, as witness was informed, the body was found, was between two and three hundred yards from the house, and on the path to and seventy-five or a hundred yards from the spring. The wound seemed to have been made with a six-shooter ball, or one of about that size. Just before the inquest, witness quizzed the defendant closely, and remarked to him that the wound on deceased's face seemed to have been made by a stab. Defendant looked surprised, and asked if deceased had been stabbed, and in the course of the conversation said that the murderer would never be found out. Witness observed nothing very peculiar in the defendant's conduct on that occasion. At the inquest, all of the deceased's family, the defendant, his wife, and Emsley Harris, were examined as witnesses. The defendant stated that he and Harris were together during all the evening and night of the murder until the body was found, and that he heard no shot that night. In the cylinder of the pistol found on the premises there were five old loads and one fresh one. Not more than twelve hours had passed, in witness's opinion, since the freshly-loaded barrel had been fired off and reloaded. No cap was on it, and the ball in the barrel was bright and fresh, but the other five were smoked. Witness saw a barrel next to the one with the bright ball shot off, and the effect was to smoke the bright ball and give it the same appearance as the others.

T. W. Gee, for the State, testified to the same effect as Edgar respecting the condition of the pistol and the effect on the bright ball of the shooting off of an adjoining barrel. Another witness testified to the same effect, and, with still another, identified themselves pretty clearly as the persons who passed Dickey's house on their way to Wichita City when the defendant said, "There is Uncle Bob now."

One Martin, for the State, testified that he bought Dickey's place in Lamar County, and paid him $580 in cash about two days before he left there. Deceased had a $100 bill and some other money besides what witness paid him.

This was all the evidence, — none being adduced by the defence.

*Barrett & Donley*, for the appellant.

*George McCormick*, Attorney-General, for the State.

White, P. J. On the former appeal this case was reversed because of the failure of the charge of the court sufficiently to explain the term "accomplice," when that term, in its application to the statutory rule of evidence with regard to corroboration, embraces principal offenders or *particepes criminis*. 4 Texas Ct. App. 46. A second trial in the court below has resulted in a second conviction of appellant for murder of the first degree and a like punishment as before, — imprisonment for life in the penitentiary being again assessed.

There are only two questions necessary to be discussed on this second appeal, viz.: *first*, the charge of the court; and *secondly*, the. sufficiency of the evidence. The indictment, in short, charges a murder upon express malice aforethought, with deadly weapons. The evidence tended to disclose a robbery as the motive inducing the homicide. With a view to this aspect of the case, the court instructed

the jury " that all murder committed in the perpetration or
in the attempted perpetration of the crime of robbery, is
murder in the first degree ; " and again : " Any person within
this State who shall wilfully and maliciously kill another,
with the fraudulent intent on his part to take from the per-
son or possession of the deceased any property, with intent
to appropriate the same to his own use, shall be deemed
guilty of murder in the first degree." Before giving these
instructions, the court had charged the statutory definition
of murder, and had explained in a very concise but com-
prehensive manner the meaning of the terms " express
malice."

It is insisted that because the indictment did not charge
that the murder was committed in the perpetration or at-
tempt at the perpetration of robbery, therefore the charge
of the court was erroneous in presenting that issue ; be-
cause that issue was foreign to the case set forth in the in-
dictment, and rendered the defendant liable to be punished
on a state of case of which he was not apprised by the alle-
gations in the indictment. We are referred to *Tooney's
Case*, 5 Texas Ct. App. 163, in support of this position.
The two cases are by no manner of means analogous, but are
in every respect essentially different. Tooney was charged
with murder by poison ; this appellant is charged, in the ordi-
nary form, with a murder committed with express malice
aforethought. The former is a special, the latter a general
charge. The distinction between the two is the same which
has always obtained in pleading, viz., that if a specific sub-
stantive matter be alleged, the pleader will be confined to
that matter, and cannot introduce in support of it other and
distinct grounds, of which the defendant was not put upon
notice nor advertised they would be relied on in support of
his conviction. If a murder is charged to have been com-
mitted by poison, then that, and that alone, is the issue
presented to the defendant ; and so with murder committed
in any of the other specific exceptional modes designated in

the statute. Penal Code, art. 606; Roscoe's Cr. Ev. (7th ed.) 720; Moo. C. C. 113.

Had the indictment in Tooney's case alleged that the murder was committed by poison *and* in the perpetration or in the attempt at the perpetration of robbery, the indictment would have been good, and would have covered that phase of the case, and the charge of the court held to be erroneous would have been the law of the case. It is a well-established rule of pleading that an indictment may charge, conjunctively, acts constituting the offence which are stated disjunctively in the statute. "This is always proper and allowable where a statute makes two or more distinct acts connected with the same transaction indictable, each one of which may be considered as representing a stage in the same offence." *Phillips* v. *The State*, 29 Texas, 233; *Lancaster* v. *The State*, 43 Texas, 519; *Hart* v. *The State*, 2 Texas Ct. App. 39. But, having charged Tooney simply with murder by poison, the prosecution was held to establish a murder by poison, and one committed in no other mode. *Warrington* v. *The State*, 1 Texas Ct. App. 168.

In the case at bar, however, as we have stated before, the indictment does not charge the murder to have been committed in any of the exceptional modes named in the statute; it is an indictment charging in the general and ordinary form a murder upon " express malice aforethought." Malice is as much the essential ingredient of murder by poison, or robbery, or any other of the specific modes, as it is of murder by violence done to the person. *The People* v. *Enoch*, 13 Wend. 159; *The People* v. *White*, 22 Wend. 176; 37 Wend. 43; 39 Wend. 245; *The People* v. *Keefe*, 40 N. Y. 348; *The People* v. *Thompson*, 41 N. Y. 1.

But when express malice is alone charged, the pleader may show in support of the indictment not only violence done to the person, but robbery, or an attempt to perpetrate robbery, or any other of the specific exceptional modes named; because they are not inconsistent with, but, on the

contrary, would be legitimate for the purpose of establishing the express malice aforethought charged. When a murder by violence and upon express malice aforethought is charged, then the prosecution may show, as part of the *res gestæ*, that it was also done (if such were the fact) in the perpetration, or in the attempt at the perpetration, of either arson, rape, robbery, or burglary. This rule was announced by this court in the first case wherein the question was raised. *Mitchell* v. *The State*, 1 Texas Ct. App. 194. And see also *Pharr* v. *The State*, 7 Texas Ct. App. 472.

It follows that, the evidence in this case being of a character tending legitimately to show that the murder was committed in the perpetration or in the attempt at the perpetration of robbery, the court did not err in the portion of the charge complained of, but the same was a part of the law as made necessary by the evidence adduced in the case.

Addressing ourselves to a consideration of the second ground relied upon for a reversal of the judgment, — the insufficiency of the evidence, — we have examined the testimony exhibited in the statement of facts with great care, to ascertain how far, if at all, the evidence of Emsley Harris, the self-confessed conspirator, who turned State's evidence, has been corroborated by other evidence tending to establish appellant's guilt.

As was said by our Supreme Court in the leading case of *Coleman* v. *The State:* "The rule of law forbidding a conviction on the testimony of an accomplice unless corroborated by other testimony tending to connect the defendant with the offence committed, is, under the statute, positive and peremptory. Pasc. Dig., art. 3118. However much a jury may be disposed to credit the accomplice, the defendant cannot be legally convicted unless the evidence of the accomplice be confirmed in some material matter tending to show the defendant's guilt. To allow convictions to stand where the corroboration is only in immaterial matters, or in matters affecting other parties, and not the party on trial,

would be to violate both the letter and spirit of the statute, and to disregard those precautionary rules which experienced and wise jurists have deemed it necessary to adopt in order to guard against erroneous convictions, based on evidence unreliable because coming from a corrupt source." (1 Greenl. on Ev., sect. 381, note.)   44 Texas, 111; *Gillian* v. *The State*, 3 Texas Ct. App. 132.

The evidence of an accomplice must be corroborated, not merely as to the commission of the crime, but also by evidence of the fact that the accused was engaged in its commission.   *Dill* v. *The State*, 1 Texas Ct. App. 278; *Davis* v. *The State*, 2 Texas Ct. App. 588.   " The corroborating evidence must of itself, and without the aid of the testimony of the accomplice, tend in some degree to connect the defendant with the commission of the offence.   It need not, as a matter of course, be sufficient to establish his guilt; for in that event the testimony of the accomplice would not be needed.   The purpose of the statute was to prohibit a conviction unless there was some evidence entirely outside of that of the accomplice which, of itself and without the aid of the accomplice, tends at least to connect the defendant with the offence committed."   *Hoyle* v. *The State*, 4 Texas Ct. App. 239; *Jones* v. *The State*, 4 Texas Ct. App. 529; *Jones* v. *The State*, 7 Texas Ct. App. 457; *Myers* v. *The State*, 7 Texas Ct. App. 641.

If we take the foregoing rules as our guides, and apply them to the facts in this case, then we are constrained to say that the prosecution, in our opinion, has failed to make out the case against this appellant.   If the testimony of the accomplice, or rather the *particeps criminis*, be left out of the case, then there is not a particle of testimony inculpating defendant in the murder of Robert Dickey.   When considered in connection with the other testimony, whatever of corroboration there is found to exist relates to matters wholly immaterial, and where they affect the prisoner more than other parties, they do not affect him with regard to the

main fact, — the commission of the murder. Defendant may be guilty, but the State only demands the punishment of a citizen when his guilt has been clearly established according to the forms and rules of law which she has prescribed for ascertaining his guilt.

Because the evidence, independent of the testimony of Harris, the *particeps criminis*, does not tend to connect the defendant sufficiently with the crime alleged to have been committed, the judgment rendered in the court below is reversed and the cause remanded for a new trial.

*Reversed and remanded.*