## Court of Appeals.

### January, 1903.

## THE PEOPLE v. JAMES P. SULLIVAN.

### (173 N. Y. 122.)

1. MURDER—FIRST DEGREE—EVIDENCE.

Under an indictment for murder in the first degree the prosecution may prove facts to bring the case within any of the provisions defining the crime.

2. SAME—DESIGN TO EFFECT DEATH, QUESTION FOR JURY—PENAL CODE, SEC. 183.

Where upon the trial of an indictment charging murder in the first degree only, the case is submitted to the jury in two aspects; that the deceased was killed with a deliberate and premeditated design to effect his death, and that he was killed by the defendant while the latter was engaged in the perpetration of a felony, or an attempt to commit one, they are not so inconsistent as to render it improper to submit both to the jury for determination, since proof either that the defendant killed the deceased with a deliberate and premeditated design to effect his death, or while the defendant was engaged in the commission of a felony, or an attempt to commit a felony, though "without any design to effect death," which phrase does not constitute an absence of intent an essential ingredient of the murder, establishes the crime charged, and the only issue to be decided by the jury is whether the defendant is guilty of that crime as it is defined by the statute (Penal Code, sec. 183).

3. SAME—WITNESSES—JURY MAY BELIEVE PART AND REJECT PART OF TESTIMONY.

The jury may find that defendant who, while on his way to commit a burglary, exchanged shots with and killed a police office, fired first, although an associate who turned State evidence testified that defendant told him to the contrary, since the jury could accept part and reject part, *i. e.*, believe that the defendant shot at the policeman and disbelieve his statement that the policeman fired first.

4. SAME—PREMEDITATION—DELIBERATION.

One who plans the commission of a burglary and arms himself, with the intent to shoot any one who opposes his design, is chargeable with such deliberation and premeditation as renders him guilty of murder in the first degree, where, while attempting to commit the burglary, he encounters and shoots a police officer.

5. SAME—OVERT ACT—BURGLARY.

Persons who provide themselves with suitable tools and go to a building with the intention of breaking into it, but whose design is frustrated while they are reconnoitering or inspecting the premises, commit such an overt act as constitutes an attempt to commit burglary.

O'BRIEN, J., dissenting.

APPEAL from a judgment of the Supreme Court rendered at a Trial Term for the county of Schoharie, October 25, 1901, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

Claude B. Mayham and Stephen L. Mayham, for appellant.

E. A. Dox, district attorney (George M. Palmer, of counsel), for respondent.

CULLEN, J.: I have been constrained to reach a different conclusion from that held by Judge O'BRIEN. I agree with him that as the guilt of the defendant was submitted to the jury on both claims of the People, first, that the deceased was killed with a deliberate and premeditated design to effect his death, and, second, that he was killed by the defendant while the latter was engaged in the perpetration of a felony or an

attempt to commit one, if as to either claim the evidence was insufficient to justify the submission of the question to the jury the conviction must be reversed, since it cannot be known on which ground the jury based its verdict. But I take issue with my associate on the proposition that there was any such inconsistency between the two claims as rendered it improper to submit both to the jury for determination. There was but a single crime charged in the indictment against the defendant, that of murder in the first degree, and the only issue to be determined by the jury was whether the defendant had been guilty of that crime. Under our statute (sec. 183, Penal Code), so far as applicable to the case before us, proof either that the defendant killed the deceased with a deliberate and premeditated design to effect his death, or while the defendant was engaged in the commission of a felony or an attempt to commit a felony, though without any design to take life, established his guilt of the crime charged. " It is not necessary that a jury, in order to find a verdict, should concur in a single view of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon the other." (Murray v. N. Y. Life Ins. Co., 96 N. Y. 614.) So in this case it was not necessary that all the jurors should agree in the determination that there was a deliberate and premeditated design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of a felony, or an attempt to commit one; it was sufficient that each juror was convinced beyond a reasonable doubt that the defendant had committed the crime of murder in the first degree as that offense is defined by the statute. Ever since the enactment of the Penal Code, and even before that time since the law of 1876, by which homicide in the commission of a felony was made murder in the first degree, it has been the practice, in prosecutions for

that crime, to submit the case to the jury in both aspects, premeditated and deliberate design to take life and killing in the commission of a felony. (Buel v. People, 78 N. Y. 492; People v. Willett, 102 N. Y. 251; People v. Johnson, 110 N. Y. 134; People v. Meyer, 162 N. Y. 357.) This is no new doctrine in the administration of the criminal law; on the contrary, the principle involved is very old. For far more than a century past it has been the practice, approved by all courts and text-writers, to charge, by the use of several counts, the same offense as committed in different manners or by different means. " There is no objection to stating the same offense in different ways in as many different counts of the indictment as you think necessary." (Archibald Crim. Practice, 93.) " Every cautious pleader will assert as many counts as will be necessary to provide for every possible contingency in the evidence, and this the law permits." (Wharton Crim. Law, sec. 424.) In this State the practice is directly authorized by statute. (Code Crim. Proc. sec. 279.) Where the several counts charge the same offense, the prosecution will not be compelled to elect on which count it will proceed. " It is every day's practice to charge a felony in different ways in several counts for the purpose of meeting the evidence as it may come out upon the trial; each of the counts on the face of the indictment purports to be for a distinct and separate offense, and the jury very frequently find a general verdict on all the counts, although only one offense is proved; but no one ever supposed that that formed a ground for arresting the judgment. If the different counts are inserted in good faith for the purpose of meeting a single charge the court will not even compel the prosecutor to elect." (Opinion of chancellor, Kane v. People, 8 Wend. 203.) In People v. Rugg (98 N. Y. 537) the defendant was indicted for murder in the first degree as charged in separate counts, some alleging premeditation and deliberation, others killing in the commission of a felony. The defendant on the trial moved that the prosecution be required to

elect on which count of the indictment it would proceed. The motion was denied and the jury rendered a general verdict of guilty. The judgment was affirmed by this court. It was held by the Supreme Court of the United States that a general verdict of guilty was good though one count of an indictment charged the offense to have been committed in a haven or bay, and another its commission upon the high seas. (U. S. v. Pirates, 5 Wheaton, 201.) The reasons for this practice are very clearly stated by Chief Justice SHAW in Bemis's Webster Case (471) : "To a person unskilled and unpracticed in legal proceedings it may seem strange that several modes of death, inconsistent with each other, should be stated in the same document; but it is often necessary, and the reason for it when explained will be obvious. The indictment is but the charge or accusation made by the grand jury, with as much certainty and precision as the evidence before them will warrant. They may be well satisfied that the homicide was committed, and yet the evidence before them leave it somewhat doubtful as to the mode of death; . . . take the instance of a murder at sea; the man is struck down, lies some time on the deck insensible, and in that condition is thrown overboard. The evidence proves the certainty of a homicide, by the blow or by the drowning, but leaves it uncertain by which. That would be a fit case for several counts, charging a death by a blow and a death by drowning, and perhaps a third, alleging a death by the joint results of both causes combined." In the case suggested by the learned judge it would certainly be unreasonable that the defendant should escape conviction because of difference of opinion among the jurors as to whether his victim was killed by the blow or by drowning, when all were convinced that the killing was effected by the felonious act of the defendant.

Nor is there the theoretical inconsistency between the two claims of the prosecution that has been assumed. It is not correct to say that if the offense was committed in one way it could not have been committed in the other. It is true that

in the definition of the second manner in which the crime may be committed the statute reads: " Without a design to effect death." But this does not render absence of intent an essential ingredient of the offense, such as the killing or the commission of the felony, elements which the prosecution is bound to prove beyond a reasonable doubt. " Without a design to effect death " is to be interpreted as meaning regardless of whether there was a design to effect death or not. This rule applies in a certain measure to the definitions of the various grades of homicide so far as those definitions prescribe the absence of an element which, if present, would constitute a higher degree of crime. By section 184 of the Penal Code murder in the second degree is defined to be the killing of a human being with the design to effect the death of the person killed or another, but " without deliberation and premeditation." By sections 189 and 193 the offense is manslaughter when committed " without a design to effect death." It is not necessary, however, that the prosecution should prove beyond a reasonable doubt in the first case that there was no deliberation, or in the second that there was no design to effect death. On the contrary, the rule is that where there is reasonable doubt in which of several degrees of a crime the defendant is guilty he must be convicted of the lowest degree. (Code Crim. Proc. sec. 390.) So an acquittal on the merits on an indictment for manslaughter or for murder in the second degree will bar a subsequent prosecution for murder in the first degree (Wharton on Homicide, sec. 898; Penal Code, sec. 36), which would not be the law if a conviction under either of such indictments could not be sustained by proof establishing the higher offense.

The direct evidence, including that of the witness Harris, who, as has been said by my associate, was sufficiently corroborated, proved circumstances which clearly established that the deceased was shot by the defendant and his associates, without relying on their subsequent statements to that effect. At about half-past one in the morning of the homicide the

deceased and the witness Warner were standing at the corner
of Main and Grand streets, in the village of Cobleskill, when,
as that witness testifies, they saw a party of four or six men,
whom he could not identify, pass up Grand street.  He then
left the deceased, went to his room and was preparing for bed
when he heard the sound of shooting, several shots.  He went
to the window and heard the barking of a dog.  The noise
appeared to come from the store of one Borst on Main street,
a short distance from the place where he had been standing
with the deceased.  He immediately went to this store and
found the body of the deceased there and several of the vil-
lagers present.  Harris testified that the defendant and his
associates turned off Main street and went towards the spot
where the body of the deceased was found; that a few moments
afterwards they returned, and that the defendant had a wound
in his hand from which a bullet was proved to have been sub-
sequently extracted, and that Hinch, another of the party, had
a wound in the shoulder, from which, also, a bullet was after-
wards taken.  A hammer which one of the party had obtained
from the tool chest which they had broken open was found at
Borst's store a few feet from the place of the homicide and
the chisels and other tools which they had taken were found
in the vicinity.  Quite a fusilade had occurred and bullets had
entered the windows of neighboring stores.  No other per-
sons except the defendant and his associates were seen in the
vicinity of the spot where the homicide occurred.  After the
shooting a party of several persons was observed by the wit-
nesses running away from that place.  From these facts the
inference seems irresistible that the encounter in which the life
of the deceased was taken occurred between him and the men
who but a few moments before had gone towards the scene
of the occurrence, the men whose tools were found at the
spot or in its vicinity and two of whom bore evidence on their
persons in the shape of bullet wounds that they had taken
part in a recent affray.  Indeed, it is not strenuously con-

tended that the proof did not warrant the jury in finding that the deceased was shot by the defendant or his associates. The claim is that the evidence was insufficient to establish the pre-meditation and deliberation necessary to constitute murder in the first degree. It seems to me that the real question in this branch of the case is rather whether the jury was justified in finding that the killing of the deceased was criminal than the degree of the crime. Though the statement of the defend-ant or one of his associates to the witness Harris, " that they unexpectedly met a policeman and he fired at them and then they fired at him, and didn't know whether they hit him or not," was, as I have said, unnecessary to establish the connec-tion of the defendant with the homicide, still, as it was put in evidence by the prosecution, the defendant was entitled to have it considered by the jury. The jury, however, was not required to believe it. The jurors could accept part and reject part; they could believe that the defendants shot at the police-man and disbelieve the statement that the policeman fired first. (People v. Van Zile, 143 N. Y. 368.) Stated in the baldest way, but reciting its essential features, the case is this: A party of several persons start along the street to commit burg-lary on the post-office; at the scene of their intended crime they meet the deceased, a police officer; an encounter takes place, shots are fired on both sides and the police officer is killed. There is no eye-witness to the occurrence except the defendants themselves, who state that the police officer fired first. Now, while the defendant and his associates were crim-inals, or, at least, contemplating crime, he is entitled to a fair measure of justice and the law is not to be strained against him, however bad may be his character. But it is impossible to disregard the errand on which he was bound in determining what actually occurred at the time of the homicide and the inferences the jury might properly draw from the occurrence. The defendant and every one of the party at the time they left Albany were armed. If a man going out at night on a lawful

errand should arm himself, and thereafter an encounter take place in which he takes the life of another person, a jury might well infer, in the absence of proof of malice or of the details of the occurrence, that he had either taken life in self-protection or in the heat of passion arising in some altercation. But these defendants did not arm themselves to protect their persons or their property. There is no reasonable explanation of their going armed, other than that they intended to shoot any person who should obstruct the accomplishment of their crime or at least any one who might seek to apprehend them or prevent their escape. Starting out on such a mission and with such intent, they meet the police officer, shots are exchanged and the latter is killed. Which is the more reasonable inference from the occurrence, that the officer of the law seeing these persons, who were strangers to him, while they were peacefully walking the street, having as yet given no evidence of any intent to commit an offense, sought without excuse or justification to shoot them, or that the defendant and his associates, fearing apprehension by the officer or being interrupted by him when they were in the attempt to commit a burglary, took his life in order that they might escape arrest? I think the jury was justified in adopting the latter view. If so, the deliberation and premeditation necessary to make out the crime of murder in the first degree could well be found to have commenced at Albany when the defendants started out on their predatory excursion; they had carried out the design then formed—to shoot any one who stood in their way.

I think the evidence was also sufficient to justify the jury in finding that the defendant and his associates were engaged in an attempt to commit a felony, to wit, a burglary, when they took the life of the deceased. " An act done with an intent to commit a crime, and tending but failing to effect its commission, is an attempt to commit that crime." As observed by Mr. Wharton (Crim. Law, sec. 2696), mere intent is not the subject of penal action and an overt act is essential to

impart to the intent criminal responsibility. The question of what overt act is sufficient to constitute an attempt to commit a crime has been the subject of much discussion by both text-writers and courts, and of some conflict in the decisions. In the early English cases the view seems to have been adopted that to constitute an attempt the overt act must be the final one towards the completion of the offense and of such a character that, unless it had been interrupted, the offense itself would have been committed. The decisions in some of these cases seem to have been based on the phraseology of the particular statutes under which the indictments were framed. This extreme doctrine has not been accepted in this country, certainly not in this State. Thus it has been held that where a prisoner put his hand into the pocket of another, intending to take its contents, it was an attempt to commit larceny, although there may have been nothing in the pocket to steal. (People v. Moran, 123 N. Y. 254; Commonwealth v. McDonald, 5 Cushing, 365.) The question in this case, however, is not as to the subject of the intended burglary, but whether the defendant and his comrades had proceeded far enough in the execution of their design for a jury to find that they were engaged in an attempt to commit the crime, there having been discovered on the building no marks of force or violence. Mr. Wharton asserts the doctrine that mere preliminary preparations in character indifferent (here they were not indifferent in character) cannot be deemed sufficient to constitute an attempt to commit the crime. (Sec. 181.) This view does not seem to be fully accepted by Mr. Bishop and appears in conflict with the decision in People v. Bush (4 Hill, 133), where the defendant having solicited one K. to burn a barn and having given him a match for that purpose, was held properly convicted of an attempt to commit arson, although K. never intended to burn the barn. But assuming that mere preparation is not in all cases an attempt to commit the crime, it is well settled in this country that it is not necessary to constitute an

attempt that the act done should be the last proximate one for the completion of the offense. "However attempt is viewed in England, the act need not, according to the American idea, be the next preceding the one which would render such substantative crime complete." (Bishop, sec. 762.) "The question whether an attempt to commit a crime has been made is determinable solely by the condition of the actor's mind and his conduct in the attempted consummation of his design. So far as the thief is concerned, the felonious design and action are then as complete as though the crime could have been, or, in fact, had been, committed, and punishment of such offender is just as essential to the protection of the public as one whose designs have been successful." (People v. Moran, *supra.*) In People v. Lawton (56 Barb. 126) a conviction for an attempt to commit burglary was affirmed. The evidence showed that the defendant and an accomplice agreed to commit the burglary on a certain night; that in pursuance of such agreement they went to the store intended to be entered, carrying burglars' tools. When they arrived there they thought that the tools were not sufficient to effect an entrance and thereupon they started to go to a blacksmith shop to get a crowbar. Before entering into the blacksmith shop alarm was given and they were arrested. The case is cited with approval by Judge Ruger in People v. Moran (*supra*). I do not see how it is possible to distinguish that case from the one before us. I do not assert that in the present case merely procuring the tools with which to commit the burglary constituted an attempt to commit it, and it may be that merely starting on the road towards the building was also insufficient to constitute an attempt. But when the defendants reached the building a different question is presented. The going to the building with the purpose of breaking into it, having procured in furtherance of that design the necessary implements, seems to me to be a sufficient overt act. It may be asked at what point of their proceedings did the acts of the defendants constitute an

attempt. It is difficult, if not impossible, to lay down any general rule by which it can be determined whether acts are too remote to constitute an attempt to commit the offense. While the defendants were at a distance from the building they might have changed their minds and abandoned the design. But if the jury believed that the defendant and his associates were at the post-office reconnoitering or inspecting it with the intent to break it open, and that they would have done so had their design not been frustrated by the presence or interference of the deceased, the police officer, then I think it could properly find that they were engaged in an attempt to commit burglary. If one with intent to shoot another should procure a pistol for that purpose, that alone might not amount to an attempt to shoot him. It may be that if after procuring the pistol he took a conveyance to the residence of his intended victim, still that would not constitute an attempt. But if after this, with his design unchanged, he approaches the person he intends to shoot but is seized before he can draw the pistol, I think he is properly punished as having attempted to commit the crime. Whenever the acts of a person have gone to the extent of placing it in his power to commit the offense unless interrupted and nothing but such interruption prevents his present commission of the offense, at least then he is guilty of an attempt to commit the offense, whatever may be the rule as to his conduct before it reached that stage. This is clearly illustrated by Judge DANIELS in People v. O'Connell (60 Hun, 109), where the defendant was convicted of an attempt to commit assault in the first degree. There it was said: "Where the assault charged be made by means of a firearm or any other deadly weapon, it is necessary for the creation of the crime that the person intended to be assailed shall not be so far from the intended assailant as to be beyond all possibility of injury from him. But that is not an essential circumstance in the case of an attempt. For the assailant may load a firearm and then start towards the person to be assailed in order to attain

reaching distance of him, or when the assault is intended to be made with an axe, which is the weapon mentioned in the indictment, the accused may obtain and raise it, intending to strike with it, when too far away from the person intended to be struck, and then approach towards that person and be intercepted before he can reach a position of danger to him, which would be an attempt to commit the crime charged. Each act would be an attempt to commit the crime charged. For a person who provides himself with an axe with which he intends to kill another, and afterwards approaches towards him to make that use of it, but is prevented from doing so by the flight of the other, or by being himself disarmed, or otherwise prevented from reaching his intended victim, commits acts tending to effect the commission of the crime within the language of this section of the Code."

The objection to the sufficiency of the indictment is disposed of in the opinion of Judge O'BRIEN. There are no other questions raised on this appeal that require discussion. The case was submitted to the jury by the learned trial judge in a charge eminently fair, in which attention was called to every rule of law which safeguards the rights of a person on trial for his life or liberty. The jury has found the defendant guilty. I believe that verdict to be justified by the evidence, and that this court is not called upon to interfere with it.

The judgment should be affirmed.

O'BRIEN, J. (dissenting) : The defendant has been convicted of murder in the first degree upon an indictment charging him with having, on the 27th day of November, 1900, shot and killed Matthew Wilson, a policeman, with the deliberate and premeditated design to effect his death.

About 2 o'clock on the morning of the day above named, Wilson was found dead upon the stone steps of a store in the village of Cobleskill, the body resting upon a platform or stoop in front of the store, which was reached by two stone steps.

He was evidently standing upon the platform when killed, as the body was found there, with the feet resting lower down upon the steps.

It appeared upon the *post mortem* examination that there were four wounds upon the body inflicted by bullets fired from a pistol or revolver. One of the bullets passed through the left wrist, another was found in the left arm about two inches below the shoulder. This was a mere flesh wound and the bullet was readily extracted. The third wound was in the shoulder directly back of the scapular, and had penetrated deep in the muscles of the right shoulder from behind. None of these wounds was serious, or of a character to produce death. The bullet that produced death entered the right side at the seventh rib from behind, obliquely passing through the rib and the middle lobe of the right lung, thence through the pericardium of the heart to the right auricle and lodged in the muscles under the left nipple, obliquely from backwards, forwards and upwards, as described by the medical testimony. The bullet when located was four or five inches higher up in the body than the point where it first entered. This, upon all the testimony, was the fatal wound, sufficient to produce instant death, and the indictment is framed and the prosecution based upon the theory that the defendant either feloniously fired the shot himself, or is legally responsible for the act if committed by some one else.

The People attempted to connect the defendant with the homicide by circumstantial evidence and by the testimony of an accomplice. There is very little information in the record with respect to the defendant's antecedent history, until we come to the 26th of November, 1900, the day prior to the homicide, when he and five other persons were at the house of a Mrs. Peters in Albany. One of the other persons was a man named Harris, who was the accomplice that testified at the trial under an arrangement with the district attorney made

while he was in prison charged with this or some other offense. The defendant was identified as one of the six persons present at the house referred to by the woman who kept it and by her two daughters. The fact of his presence there is sufficiently established without the testimony of Harris, but what these persons were doing, or why they were together on that occasion, is not made very clear by the inmates of the house. It seems that three or more of the party took meals at the house, and the woman who testified, or at least one of them, said that she heard some conversation among them about a bank, the inference sought to be drawn from this testimony being that they were consulting upon the subject of robbing some bank. The jury, we think, could have found that some or all of the party were criminals, or at least that they were about to commit some crime, the precise nature of which is not clearly disclosed by the evidence. But their subsequent movements, culminating in the death of Wilson, so far as there is any direct testimony upon the subject, must rest almost wholly upon the testimony of Harris, the accomplice.

He tells us that he was present at the meeting in Albany; that he and two other persons boarded or took meals at the house where they were, but did not disclose the plan of action agreed upon, if any; that at about 7 o'clock in the evening of the 26th of November the whole party boarded a freight train that ran from Albany to Cobleskill, about forty-five miles distant. It appears that they rode on top of the cars as tramps, and were seen by the conductor, who did not interfere with them, so far as appears. They had bottles of whisky, which they imbibed quite freely on the journey, and the proof shows, or tends to show, that some or all of them, including the defendant, were drunk. The train stopped some time at the first station after leaving Albany, and the party all got off, but boarded the train again when it was about to start, and it arrived at Cobleskill about 11 o'clock. Harris relates the movements of the party from that time substantially

as follows: After landing they walked on the railroad to a small shanty, broke the door, went in and remained there until about 1 o'clock in the morning smoking and drinking. Then they went to a coal house on the railroad in process of construction. There they broke open a tool chest, from which they took some chisels and tools. Then following the railroad, they went to a section shanty and, finding it locked, broke it open and took from it an iron crowbar. Harris says that he carried the crowbar, the defendant a hatchet, and some of the others the chisels, and they proceeded to the main street of the village. According to Harris, when they all got off the train at the station, they spoke of robbing the post-office, which was on the main street, opposite the store where the shooting occurred. Before reaching this point on the street Harris says he and another of the party separated from the rest, and he threw away the iron bar upon a grass plat, leaving the others with only a hatchet and chisels. From this point Harris says that he has no personal knowledge of what occurred until the party was again united after the shooting, but he testified that he heard the firing, and when he and his companion were joined by the rest they, including the defendant, told him that they had suddenly and unexpectedly met the policeman, who ordered them to stop, which order they disobeyed, whereupon he commenced to fire at them and they returned the fire. He did not, as he says, see the shooting, and, of course, was unable to identify the person who fired the fatal shot.

The testimony of Harris, the accomplice, so far as it relates to the journey of the party on the freight train, the arrival at Cobleskill, the breaking into the coal house and shanties, the procurement of the tools and crowbar, and the flight of the whole party across the country, their concealment in barns during the night and other incidents which he related, was corroborated by abundant proof; but his separation from his associates at the critical time and his absence from the immediate scene of the homicide, and the alleged statements or

admissions made by his associates after the shooting as to the circumstances under which it took place, all rest upon his own statements. It was shown that the defendant was shot in the hand by a bullet which was subsequently extracted, and another of the party in the shoulder. The dead policeman's revolver was found near his body with five of the six chambers bearing evidence of having been recently discharged, and it is conceded that he could not have used it after he had received the fatal wound.

These are the material facts upon which the conviction must stand or fall. The case was submitted to the jury in two aspects. The jury was permitted to find that the defendant fired the fatal shot with a deliberate and premeditated design to effect the death of the person killed, or procured, aided, counseled or advised the act which resulted in his death. The case was also submitted to the jury upon the theory that they might find from the evidence that the defendant, without deliberation or premeditation, killed the deceased, or aided or abetted in the commission of the homicide while attempting to commit a felony under the last clause of the statute. We cannot know upon which of these theories the jury based the verdict, and, therefore, the prosecution must show that the proof justified the court in submitting the case in both aspects, and that there was evidence upon which the jury could find that the homicide was committed while the defendant was engaged in an attempt to commit a felony and that the act was the result of deliberation and premeditation. The learned counsel for the defendant contends that these two theories of the case could not have been submitted to the jury upon a common-law indictment, but that the facts should have been alleged in order to bring the case within that clause of the statute which declares it to be murder in the first degree to commit the homicide when the accused is engaged in the commission, or in the attempt to commit a felony. The authorities do not support

this contention. The law is now settled that under an indictment in the common-law form the prosecution may prove facts to bring the case within any of the provisions of the statute defining murder in the first degree. (People v. Giblin, 115 N. Y. 196; People v. Osmond, 138 id. 80; People v. Constantino, 153 id. 24; Cox v. People, 80 id. 500; People v. Meyer, 162 id. 357; People v. Willett, 102 id. 254; People v. Conroy, 97 id. 62; Keefe v. People, 40 id. 348; Kennedy v. People, 39 id. 245; Fitzgerrold v. People, 37 id. 413; People v. White, 22 Wend. 176.)

In one of the barns where defendant and his confederates were concealed during their flight from the scene of the homicide a bottle of nitro-glycerine was found, which was evidently left there by the party, and the possession of this substance, with the tools and implements already described, proved, as is contended, that the party had planned and were about to commit a burglary when they came upon the deceased. This conclusion is, doubtless, supported by the evidence, and the jury could have found that the design of the party was to break into the post-office, but, when the firing commenced, Harris, the accomplice, according to his statement, had separated from the rest and had thrown away the crowbar, their most formidable instrument for use in the commission of this intended burglary. While the parties still had the chisel and the hatchet, and so far were prepared to make the attempt to break into the building, it is certain that no overt act was committed to that end, and the question is whether the purpose and intent of the parties had yet reached such a stage of action as to constitute an attempt to commit burglary within the meaning of the statute defining murder in the first degree. Of course, if they had entered the building, and, while there, or in attempting to escape, had killed the watchman, although in self-defense, or in order to save their own lives, plainly the act would be murder in the first degree; and if there is no substantial distinction between that case and the one at bar,

then it must follow that it was properly submitted to the jury. Whether the defendant and his associates were at the time of the homicide actively engaged in an attempt to commit a felony, within the meaning of the statute defining murder, is a question that seems to me not entirely free from doubt. None of the cases cited on this point by the learned counsel for the People are quite like this. Some of them, it is true, bear a close resemblance to it, while others differ widely. In none of them was the question involved with respect to what acts constitute an "attempt to commit a felony" within the meaning of the statute defining murder. (People v. Lawton, 56 Barb. 126; McDermot v. People, 5 Park. Cr. Rep. 104; People v. Moran, 123 N. Y. 254; Mackesey v. People, 6 Park. Cr. Rep. 114; Com. v. Jacobs, 91 Mass. 274; Com. v. McDonald, 59 id. 365.) The proof in this case would justify the finding that the defendant and his associates intended to commit some burglary, and that they provided themselves with tools for commiting it, but whether there was any overt act to carry out the design is not so clear. But assuming that there was evidence to submit to the jury in support of the theory that the defendant killed the deceased while engaged in the attempt to commit a felony, we must also hold, in order to uphold the conviction, that there was evidence to support the charge that there was a deliberate and premeditated design on the part of the defendant to effect the death of the person killed. Since both theories were submitted to the jury, they must find support in the proofs, and as there was no proof to show that the defendant fired the fatal shot, it was necessary to show that the whole party was acting in concert under an agreement or conspiracy, not only to commit a felony, but to take human life if thought necessary. All we know about the circumstances immediately preceding the homicide is based upon the statement or admissions of some one in the party, testified to by Harris, the accomplice, that they came suddenly upon the policeman, who commanded them to stop, and upon the refusal to do so he commenced to

fire, and the defendant's party returned the fire, which resulted in the death. The question arises here whether the proof was sufficient to warrant the jury in finding that the defendant killed the deceased from a deliberate and premeditated design to effect his death. If it was not, then the case should not have been submitted to the jury under the first clause of the statute defining murder.

The proof in the case does not show that the party had any well-defined plan in mind when they left Albany. It does show, or tend to show, that some or all of them were more or less intoxicated, and while that does not excuse the act it bears upon the question of intent, deliberation and premeditation. It is evident enough that they were not professional, or at least skilled burglars, since if they were they would not be likely to trust to the chance of procuring the necessary tools for their purpose at the place where their operations were to be carried on, or to throw away the crowbar before they had reached the building that they had designs upon. They were criminals, no doubt, of some grade or capacity, but the whole transaction from beginning to end tends to show that they were of an inferior order, without much skill, experience or ability. They were really a band of tramps, probably intoxicated, bent upon some mischief, but precisely what it was it is very difficult to gather from the proofs. Aside from the testimony of the accomplice as to the talk among themselves, there is as much reason to believe that they had designs upon the bank or any other building in the vicinity as upon the post-office. Since there is no proof in the case to identify the person who fired the fatal shot, the defendant's legal responsibility for the homicide must rest upon the fact that he was one of a party that had entered into a joint agreement, conspiracy or confederacy to take human life if necessary in aid of some common criminal design. In order to hold the defendant responsible for the acts or statements of the rest of the party or any of them the proof must come up to this

standard. Passing for the present the question whether the case was properly submitted to the jury on the theory that the homicide was committed while the defendant and others were engaged in an attempt to commit a felony under such circumstances as to render any one of the party responsible for the acts or statements of the others, I do not think that the evidence was sufficient to warrant a finding that the killing of the deceased was the result of a deliberate and premeditated design on the part of the defendant to effect his death. That intent and design cannot, upon the evidence, be imputed either to the defendant personally or to any confederacy of which he was a member.

The evidence certainly warranted the jury in finding that the defendant was present and acting with his associates, and that they were engaged in some criminal scheme that failed of execution, but resulted in the homicide. This policeman, engaged in the performance of his duty, met his death by the act of one or more of a combination of criminals, and courts ought not to be astute to relieve any of them from the punishment which the law prescribes for such a wicked act. At the same time the defendant is entitled to a fair trial and to the benefit of the rules of law applicable to criminal procedure. The difficulty with the case is that we cannot affirm the judgment without holding that the proof sustains two propositions of fact that apparently are somewhat in conflict with each other. The one is that the defendant killed the deceased with a deliberate and premeditated design to effect his death, or counseled, aided or abetted the killing with a like design. The other is that, without any design to effect death, he killed the deceased or counseled, aided or abetted the killing while engaged in the commission of a felony. The criminal act resulting in death is different in nature and character under the two provisions of the statute, and while the People had the right to give proof under the indictment of all the facts, yet when the proof was all in it could not establish

both propositions. If the proof tended to show that the deceased was killed without any design to effect death, but while the parties were engaged in an attempt to commit a felony, it necessarily excluded the theory that he was killed from a deliberate and premeditated design. It would seem to follow that the case should have been submitted to the jury on one theory or the other, and not upon both. But while conceding that both theories should have been established by proof, it is contended that both were properly submitted to the jury, since half the jury might have accepted one theory and the other half the other theory. I am unable to appreciate the force of the reasoning in support of this proposition. If it be correct it must follow that the chances of a conviction are very much improved by the introduction of various theories in support of a single charge. If, for instance, it were possible for the prosecutor to try the case upon a dozen theories and a single juror could be induced to assent to each theory, the whole body could unite in a verdict of guilty, although no one theory could command the assent of more than a single juror. This method of procedure, with all respect, strikes me as very much like what has long been known in legislative parlance as log-rolling, the art of which consists in framing a bill with numerous separate or independent provisions, none of which would pass upon its own merits, but each of which is made attractive enough to command a certain number of votes, which, being united, are sufficient to pass the bill. The Constitution contains some provisions intended to suppress this vice in legislation, but it was never supposed that it could be introduced into the jury room and applied in a capital case. The argument in favor of it ought not to be accepted unless the reasons and authority in favor of it are clear and conclusive, and I am bound to say that, in my opinion, they are not.

The case was submitted to the jury upon the theory that there was evidence to support two conflicting propositions of fact, namely, that the homicide was committed from a delib-

erate and premeditated design to effect the death of the person killed and that it was committed without any such design or any intent to effect death, but when the accused was engaged in an attempt to commit a felony. When a capital case is submitted to a jury upon two different theories concerning the facts, the evidence must be of such a character as to sustain both. If either theory is not supported by evidence a verdict based upon the whole case cannot be permitted to stand. Of course a homicide may be committed by one engaged in an attempt to commit a felony, with the intent to kill and with deliberation and premeditation, and then all the elements constituting murder in the first degree are established, but in this case all we know and all the jury could know concerning the circumstances of the shooting is what Harris, the accomplice, says, that some one of the party admitted to him after it took place, and that was that the party, when walking in the street, came upon the policeman suddenly and unexpectedly and he commenced to fire at them and then they fired at him and the fusilade resulted in the death of the deceased. The responsibility of the whole party of six men for the death of the person killed is, upon the facts, the same as to each one of them. If this defendant is guilty of murder in the first degree, so are all the others. No intent, deliberation or premeditation can be imputed to the defendant that is not to be imputed to the whole body. The proof must show that at some appreciable space of time prior to the firing of the fatal shot the defendant and his associates, confederating together, and acting in concert, formed a deliberate and premeditated design to effect the death of the person killed, or some human being. (People v. Wilson, 145 N. Y. 628.) Considering all the circumstances of this case, from the interview between the parties in Albany, the journey on the freight train, the arrival at Cobleskill, the condition that the party were in, the alleged separation of two of them from the rest when the crow-

bar was left behind, the firing when the deceased was standing on a platform in front of a store upon which it is not claimed they had any design, or intended to enter, it cannot, I think, be said that there was such proof of all these elements of murder in the first degree as to sustain the verdict. The identity of the person who fired the first shot is an important element in the determination of the question. The only direct proof on that point is to be found in the testimony of the accomplices as to the statement of the party that the policeman fired first, when they refused to stop and then they returned the fire. It is suggested that the jury could have rejected these statements as untrue, and assuming that they could, the question arises, what could they have substituted in its place. Nothing except the theory which seems to me to be without any support in the proof at all, and that is that the defendant or some one in the party of which he was one fired the first shot. That proposition must be made out, if at all, by pure conjecture and speculation. Certainly no one can say that it is established beyond a reasonable doubt. What the accomplice testified to on this point is quite as reasonable and probable as anything else that he said, and to reject it without anything but inference or presumption to substitute in its place is rather an extreme principle to apply in a capital case. If the conviction must rest upon the fact that the party of which the defendant was one were engaged in an attempt to commit a felony, namely, the burglary of the post-office, that proposition is not free from doubt. In order to establish it within the meaning of the statute there must be proof of something more than the intent or the possession of some of the tools, such as the chisel and hatchet, but there must be some overt act, such as an actual physical interference with the person where robbery and larceny from the person is intended, or some physical interference with the house or building when burglary is the subject. (People v. Moran, 123 N.

Y. 256; Mulligan v. People, 5 Park. Cr. Rep. 105; Cox v. People, 80 N. Y. 511, 517; People v. Stites, 75 Cal. 570; People v. Phelps, 61 Hun, 115.)

In this case there is proof of the intention, and proof that the party had in their possession some of the instrumentalities for the commission of burglary, even after the crowbar had been dropped out, but they had not yet arrived at the building and had made no physical attack upon it, or committed any overt act towards entering it. Aside from the fact that they were near to the building, they were practically in the same position that they were when they started from the coal house, or the shanty near the railroad track. On the whole it seems to me that the case is too close and doubtful to warrant us in affirming the conviction upon the record now before us. If we are to believe the accomplice, he and another of the party threw away the crowbar, the most formidable instrument that the party had to break into a building, and separated from the rest. There is no proof of any act on the part of the defendant or the others constituting an attempt to break into the post-office. Whatever may have been said among themselves by any of the party as to their purpose or intentions, there is no proof that the deceased heard or knew anything about it. The elements that constitute murder in the first degree have to be supplied by inferences and presumptions that are scarcely permissible in a capital case. Aside from the testimony of the accomplice as to the admission by some one that the deceased commenced to fire first and that the party or some of them fired in return, there is no proof of the facts and circumstances under which the crime was committed. Whether it was preceded by the intent to kill and by deliberation and premditation, those essential elements in the crime of murder in the first degree, is a matter of mere inference which in this case is little better than speculation. These elements of the crime were not established beyond a rea-

sonable doubt, in my opinion, and hence there should be a new trial.

GRAY, MARTIN, VANN and WERNER, JJ., concur with CULLEN, J.; O'BRIEN, J., reads dissenting opinion; PARKER, Ch. J., absent.

Judgment of conviction affirmed.