(40 Misc. Rep. 308.)

### PEOPLE v. SULLIVAN.

(Supreme Court, Special Term, Schoharie County. March, 1903.)

1. MURDER—NEW TRIAL—NEWLY DISCOVERED EVIDENCE.

A motion for new trial on conviction of murder for newly discovered evidence cannot be granted where there is not a reasonable presumption that such evidence, if presented at the original trial, would have changed the verdict.

2. SAME.

That an accomplice of the defendant, the principal witness for a prosecution on a trial for murder, had sworn falsely when he testified that he had never been convicted of a felony is no ground for a new trial.

3. SAME—IMPROBABILITY OF EVIDENCE.

On a conviction of murder, new trial for newly discovered evidence of two tramps and criminals impeaching the statement of a witness for the state that he was with defendant at the place of the murder, and tending to show that defendant could not have been within many miles of such place when the murder was committed, will be denied where the evidence bears every indication of having been fabricated for the purpose of a new trial.

4. SAME—IMPEACHING EVIDENCE.

Newly discovered evidence tending to impeach evidence of an accomplice, on whose testimony accused was convicted, is no ground for new trial.

James P., alias "Whitey," Sullivan, was convicted of murder, and moves for a new trial. Denied.

S. L. & C. B. Mayham (Lewis E. Carr, of counsel), for the motion. Edward A. Dox, Dist. Atty. (George M. Palmer, of counsel), opposed.

¶ 1. See Criminal Law, vol. 15, Cent. Dig. § 2336; Homicide, vol. 26, Cent. Dig. § 687.

BETTS, J. The defendant was convicted at the Trial Term in Schoharie county of the crime of murder in the first degree. An appeal was taken therefrom, and affirmed by the Court of Appeals (reported in 173 N. Y. 122, 65 N. E. 989), and the date fixed for the electrocution of the defendant. Subsequently, at the instance of Rev. Father Curry, of New York City, the Governor granted a reprieve until the 10th day of March.

This proceeding came before me on an order to show cause, granted by Mr. Justice Herrick, returnable at the Columbia Special Term, to show cause why a new trial should not be granted on the ground of newly discovered evidence. The application is made under section 465 of the Code of Criminal Procedure, subd. 7. Section 465 is as follows:

"The court in which a trial has been had upon an issue of fact has power to grant a new trial when a verdict has been rendered against the defendant, by which his substantial rights have been prejudiced, upon his application, in the following cases: * * * (7) Where it is made to appear, by affidavit, that upon another trial, the defendant can produce evidence such as, if before received, would probably have changed the verdict; if such evidence has been discovered since the trial, is not cumulative; and the failure to produce it on the trial was not owing to want of diligence. The court in such cases can, however, compel the personal appearance of the affiants before it for the purposes of their personal examination and cross-examination, under oath, upon the contents of the affidavits which they subscribed."

Three points are sought to be made by the defendant on which a new trial is asked for:

First. The principal witness upon the trial was one William G. Harris, alias "Sheeney" Harris, who was an accomplice with the defendant in a plot to rob a post office at Cobleskill. Harris testified upon the trial, in substance, that he had never been arrested for or convicted of any felony. The papers submitted by the defendant on the hearing tend to show that Harris had been confined in the Erie County Penitentiary under a conviction of the crime of burglary of a post office at Marcy or Tracy, N. Y., and had served a term there for that crime; and it is argued, if that fact were laid before the jury, a different result might have been reached.

Second. The application is also made upon the affidavits of one George Arden, who recites in his moving affidavit that he resides at the corner of Nassau and Adams streets, in the borough of Brooklyn; and of one Harry E. Hamlin, who recites that he resides at No. 4 Charlton street, in the borough of Manhattan. Their affidavits are, in substance, that each of them was at the saloon of one Cuddy, in the city of Albany, 45 miles from Cobleskill, on the night of November 26th and extending into the morning of November 27th, with the defendant, Sullivan, for such a length of time that it would have been impossible for Sullivan to have gotten to Cobleskill and committed the crime with which he is charged. In this connection the affidavit of one John Butler is submitted, who had been instrumental in bringing the matter of the conviction of Sullivan to the attention of Arden and Hamlin. The defendant argues that, if this testimony was submitted upon a new trial, it would probably have changed the verdict of the jury.

Third. The affidavit of one James J. O'Reilly is submitted, in which he says, in substance: That he knows the said William G. Harris, and that, about 10 days after the report of the murder of Wilson, Harris came into O'Reilly's Hotel on Morton street, in the city of Albany, and said: "I shot and killed Matthew Wilson. I had to do it to save my own life. He shot at me, and I had to shoot him to save myself." That one Edward J. Murphy was in the place at the time, and must have heard this statement. And the affidavit of said Edward J. Murphy is submitted, in which he recites that he did hear it, and from this it is argued that a different verdict might have been rendered had this testimony been before the jury.

I shall briefly consider these different points in giving summary reasons for the action taken on this application.

First. As to the alleged fact of Harris having been confined in the Erie County Penitentiary. Harris was indicted for murder in the first degree for the same crime for which Sullivan was indicted. His testimony shows that he went along with the defendant and the other four to Cobleskill, armed, with the intention of committing a burglary. He desisted, according to his own testimony, from participating in that burglary, for two reasons: One was the fact that some of his pals or associates, including the defendant, had whisky with them, and were getting under its influence in such a way that Harris feared detection would result; and the other, that shortly before reaching the post office Harris claims that he and another of the six saw two men watching them. The only reasons, therefore, assigned by Harris for not participating in this burglary are prudential reasons. No remorse nor repentance or any higher motive than personal fear. Hence the character of Harris was shown to the jury, which tried Sullivan by himself, in just as unenviable a light as it could have been had the additional fact that he had been convicted of the crime of burglary been actually shown. It was also shown that he was taken from the Schenectady county jail to Schoharie at or about the time of the trial of Sullivan, and the reason for his incarceration in the Schenectady county jail did not appear. It is evident, then, that the jury, believing or not believing the testimony of Harris, was under no delusion as to the character of the man who was there testifying.

It is a very pertinent fact also, as bearing upon this point, that Harris was not produced before the grand jury which found the indictment against Sullivan. Subsequently, and prior to the trial, a motion was granted that the district attorney furnish the minutes before the grand jury to the defendant's counsel, which was done. Upon those minutes a motion was made to dismiss the indictment, which was denied. The trial judge, having all the facts before him, decided that there was sufficient evidence before the grand jury, which, unexplained and uncontradicted, would warrant the conviction of Sullivan by a trial jury, and that evidence did not include any evidence of Harris. There was no explanation or contradiction given upon the trial, except three witnesses produced to establish an alibi, whom the jury evidently did not believe.

Second. This motion was made before me at Hudson, March 7th. A reprieve had been then granted to Sullivan, which delayed his electrocution until March 10th. Upon the very voluminous record then received, application was made to the Governor for an additional respite for two weeks, which was granted, and a respite extended until March 24th. Immediately upon this action of the executive I ordered the witnesses Arden, Hamlin, and Butler to appear before me at chambers at Kingston for an oral examination. In response to this order, Hamlin and Arden appeared, and were examined and cross-examined at great length. Hamlin testified, in substance, that he was a gambler, and had been such from his youth; had followed the races from one city to another, and had plied his vocation of a gambler in all the principal cities of the United States; that he had no home except that he said he made his "home base" in Chicago, Ill.; that he usually spent from a few weeks to a few months in one city, and then traveled to another; that at the time the statement was originally made to Father Curry he was residing at 410 West Nineteenth street, in the city of New York, with his wife. Immediately after making this affidavit, for fear of annoyance to him or his wife, which they were subjected to on account of this affidavit made in this matter, he moved to No. 4 Charlton street, New York, and stayed there eight days, when, on account of claimed annoyances by detectives and interviewers, he went out of the state to Boston, Mass., with his wife, left her there, and returned to New York, and was temporarily stopping with three or four men in a room, paying $1 a week to one of these men. He did not know the names of all his roommates, nor did he know the location of the house, nor the owner or person in charge thereof. He was interrogated at great length, and, although he carefully iterated and reiterated that it was the night of November 26th and morning of November 27th when he was at this Albany saloon and saw the defendant, he was unable to give any other date at which he had been at any other place, and he was entirely unable to give any satisfactory reason for fixing this date as the 26th of November, as it was some months after this 26th of November before the matter was called to his attention.

Arden's original affidavit stated that he resided at the corner of Adams and Nassau streets, in Brooklyn. He at once, upon making his affidavit, moved from there, if he ever resided there, and now is living in a house a distance from this place, paying a small weekly compensation therefor when he has the means so to do. He testified that his business is that of a peddler, traveling from one place to another; that he has no home, no fixed place of abode, stops where the night or his business overtakes him, and often sleeps for a considerable length of time in a box car, when he is unable or not desirous of procuring other lodgings. He said that he went to this saloon the night in question to see if he could not borrow some money to pay for goods that he was expecting. He became very much confused when questioned as to whom he expected to borrow this money from, or to whom it was to be paid. He testified, in the first place, it was to pay "Jim, the peddler," and, finally, that he went there to see if he could not borrow the money from "Jim, the

peddler." There is nothing from his testimony by which any court or jury could gather any reason for his remembering this date.

John Butler did not appear. The reason assigned by his counsel was that he feared arrest by some criminal authority, apparently the Pinkerton detectives or United States authorities, so he was not produced. It was shown in the proceeding that he had been convicted of crime.

There is absolutely nothing in the testimony of either of these two men that would lead any court to think that a jury confronted with the testimony produced upon that trial and the testimony of these two men would be at all likely to change its verdict. The two men are without a home, without any respectable means of livelihood, wanderers, not residents of this state, associates of criminals, frequenters of low resorts, and without any of the appearance of truthfulness in their narrative. They may or they may not have seen Sullivan at the saloon of Cuddy in question. There is nothing in their testimony that would be likely to convince any one that they saw him there upon the particular date which they fix and cling to tenaciously. It appeared upon the trial that Sullivan was accustomed to hanging about and being at this Cuddy's saloon. It did not appear that he had any connection with it, that he worked there, or used it for any purpose except as a resort, a drinking place, or a place of congregating with others of like character at different occasions and on many occasions. The testimony of Arden and Hamlin is that he was there when they were there, serving drinks, acting as bartender, and on at least the night in question was there in charge, and closed up the saloon. It is past all credence that, if this man Sullivan had been an employed bartender upon this night in question, within 45 miles of the scene of the murder, that his employer, the members of his employer's family, if he had any, and the other bartender (as it appeared on the trial there was a bartender there), would not have been produced on this trial originally to establish this alibi. It is also past belief that Sullivan, innocent of this crime of murder, would have declined himself to go upon the stand, and have testified to this complete alibi. He was furnished counsel by the state, and furnished means for procuring any and all witnesses desired. The story bears upon its face every indication of having been fabricated to meet the dire exigencies of the occasion.

Third. O'Reilly and Murphy are shown to have been repeatedly indicted for different crimes in Albany. This evidence would be introduced for the purpose of discrediting the testimony of Harris, the accomplice. Here Harris is claimed, within 45 miles of the scene of the crime, to have openly stated in the hearing of two persons, within 10 days of the tragedy, that he killed Wilson for the murder of whom Sullivan has been convicted. It is an unlikely story. These witnesses are in the part of town in which the saloon of Cuddy is, a familiar place of rendezvous of Sullivan. If they did not know him, as they testified, from the character of the men in the place, it is extremely likely that they would have done everything they could at the time of the trial to have assisted in his acquittal, or to have ben-

efited him, as this claimed statement was said to have been made about 10 days after the report of the murder. If these men were produced, they would be confronted with their record. A new trial on the ground of newly discovered evidence will not be granted for the purpose of discrediting a witness solely. Stewart v. Bonnell Co., 20 Misc. Rep. 174, 45 N. Y. Supp. 735. "In a motion of this character the court is called upon to consider the question whether the proposed evidence would, if given on the trial, have changed the verdict. That determination necessarily requires the court to consider the probable effect of the proposed evidence, and necessarily involves an inquiry into the character of the proffered proof, and the estimate the jury may, and properly would, make of the character of the proposed witness offering such testimony for the purpose of determining whether the proposed evidence would have changed the verdict." People v. Shea, 16 Misc. Rep. 111, 119, 38 N. Y. Supp. 821, 827, "Nor can this court, in determining whether or not a new trial should be granted on this proposed newly discovered evidence, adopt the humane rule of giving the prisoner the benefit of any reasonable doubt, which should control a jury in rendering a verdict in a criminal action. The proposed evidence must raise a reasonable presumption that its reception would have changed the verdict of the jury, or that, on a new trial, it would produce a different verdict, before the court can order a new trial." Shea Case, supra, and cases there cited. I am convinced that the testimony of these two men, were they produced on the trial, and did they swear as they do now, would not be likely to change the result.

It is not a pleasant duty that devolves upon the court of deciding, from conflicting testimony laid before it, as to whether a new trial in a capital case should be granted. The trend of the decisions is, the common-sense view of the proposition is, that each case must be decided upon its own merits, and as the evidence submitted would seem to warrant. I can see nothing in this record disclosed before me, and in the oral testimony taken here, that leads me to think that, if such evidence had been produced originally upon the trial, it would probably have changed the verdict. Hence I am constrained to deny the motion for a new trial.

I deem it only proper to say, in view of the fact that the reprieve of the defendant was originally granted at the instance of and on the application of Rev. Father Curry, of New York City, that the proceedings had before me developed the fact that his action was taken from broad humanitarian views, and with a desire that justice should be done, and that his confidence in the witnesses was evidently misplaced.

Motion denied.