■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES CONROY, Appellant. [861 NYS2d 46]—

Judgment, Supreme Court, New York County (Richard D. Carruthers, J.), rendered March 25, 2004, convicting defendant, after a jury trial, of grand larceny in the first degree (three counts), tampering with physical evidence (two counts), and conspiracy in the fourth degree, and sentencing him to concurrent terms of 4 to 12 years on the larceny convictions and 1 to 3

years on the tampering and conspiracy convictions, unanimously modified, on the law, to the extent of vacating the tampering convictions and dismissing those two counts of the indictment, and otherwise affirmed. Appeal from order (same court and Justice), entered on or about March 15, 2004, which denied defendant's CPL 330.30 motion to set aside the verdict, unanimously dismissed as taken from a nonappealable paper, and as subsumed in the appeal from the judgment. The matter is remitted to Supreme Court, New York County, for further proceedings pursuant to CPL 460.50 (5).

The verdict convicting defendant of three larcenies from Evergreen Securities Fund, a fund managed by Martin Boelens— who also was convicted of various federal and state fraud crimes—of $5 million, $9.7 million and $13 million, was based on legally sufficient evidence and was not against the weight of the evidence. Boelens first met in late October or early November of 1999 with both William Zylka, the central player in the fraudulent scheme charged in the indictment, and defendant, a lawyer at a well-known law firm in Manhattan with expertise in corporate matters and sophisticated financial transactions. By that time, defendant had lost his partnership position at the firm, was earning much less than he had in prior years and was having financial difficulties. The jury heard compelling evidence, independent of Boelens, from which it reasonably could have concluded that defendant knew, even before the first meeting with Boelens, that Zylka was a virtually impecunious swindler and not the magnanimous billionaire he professed to be. Among other things, the jury heard evidence that Zylka had failed to repay defendant the substantial sums of money he had loaned to Zylka, in steadily decreasing amounts; evidence that defendant had swindled an elderly woman, Guna Munters, out of some $200,000 representing the proceeds of a refinancing of her home that she invested in a supposed shipping venture in Latvia that Zylka promised would be repaid, along with an immense, $5 million profit when the Latvian deal went through; evidence that defendant had falsely represented that Ms. Munters had been employed by an entity controlled by Zylka in letters defendant prepared in connection with another refinancing of her home arising out of a looming foreclosure caused by Zylka's failure to keep his promise to make the mortgage payments; evidence that defendant knew that Zylka had managed to persuade Ms. Munters to give him the $30,000 proceeds from the refinancing; and evidence that defendant represented Zylka in Zylka's unsuccessful efforts to borrow $1 million from a Russian man named Finkel on highly favorable terms (18% interest with the loan to be repaid after one year

and a $500,000 bonus to be paid three years later) that was to be collateralized by a property Zylka owned in Connecticut, a property that defendant knew had been appraised at only $150,000.

With respect to the first theft, of $5 million, from Evergreen, there was a wealth of evidence from which the jury reasonably could have concluded that defendant knew that Zylka was seeking to steal $5 million from Evergreen by falsely representing that the value of the collateral being offered by Zylka to back the $120 million guarantee by a Zylka-controlled entity of Evergreen's obligations, which was worth only about $1 million, was worth the hundreds of millions of dollars that Zylka assured Boelens it was worth. That evidence included evidence from which the jury reasonably could have concluded that: (1) the collateral, a limestone property in Montana known as MGM Land, was not even owned by Zylka when he first claimed to own it, contrary to his representations that it had been in the ostensible Zylka trust structure for decades; (2) defendant, on account of his role in the negotiations with the actual owner of MGM that led to its acquisition by the Zylka entity issuing the guarantee, knew that it was worth, at most, little more than the $1 million Zylka agreed to pay to the owner; (3) defendant not only made a false representation to the owner that his law firm had already received the first installment payment (of $250,000) due to the owner from Zylka to induce the owner to transmit to defendant the stock certificates for MGM, but made that false representation for the purpose of advancing Zylka's scheme; (4) defendant knew that the $5 million "loan" that Evergreen was providing to MGM in exchange for the guarantee was not being used exclusively by MGM in mining operations (as was required by documents defendant drafted) but instead was being used in part to finance the acquisition of MGM for $1 million, the very asset that supposedly was so valuable as to constitute more than adequate collateral for the $120 million guarantee; (5) defendant well knew, contrary to Zylka's representations to Boelens, that he, defendant, was not the trustee of a Zylka family trust created by defendant that owned the limestone property; (6) defendant falsely assumed the role of a cautious trustee, not merely a lawyer, with his own decision-making authority over the potential deal with Evergreen, and thereby added an air of respectability and legitimacy that Zylka would not have had on his own; (7) defendant prepared two different escrow agreements for the $5 million, the one that Boelens received that made clear that Evergreen had an interest in the $5 million and the one submitted to defendant's law firm that made no mention of Evergreen and stated that the money would be

held solely for MGM; and (8) defendant personally received $50,000 of the $5 million with his law firm receiving $100,000.

From this and other evidence, the jury reasonably could have concluded that defendant shared Zylka's larcenous intent and committed various acts that were intended to aid and did aid Zylka in the commission of a $5 million larceny by false pretenses from Evergreen. Although the assistance defendant provided to Zylka in the commission of the other two larcenies was less extensive, from all the evidence the jury reasonably could have determined that defendant continued to act with the requisite intent "to deprive another of property or to appropriate the same to himself or to a third person" (Penal Law § 155.05 [1]). Weighing the "relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (*People v Bleakley*, 69 NY2d 490, 495 [1987]), we conclude that the verdict convicting defendant of the three larceny counts and the conspiracy count was not against the weight of the evidence.

The People's position at trial was that defendant was guilty of three of the larceny counts, the ones for which he was convicted, on either a false pretenses or an embezzlement theory of larceny (*see* Penal Law § 155.05 [2] [a]). We need not determine whether the evidence was legally sufficient to establish defendant's guilt on the embezzlement theory. Rather, defendant's conviction for the three larceny crimes can and should be sustained on the basis of the legally sufficient evidence that provided compelling proof of his guilt of larceny by false pretenses (*see People v Ponnapula*, 229 AD2d 257, 273 [1997] ["when disjunctive theories of criminality are submitted to the jury and a general verdict of guilt is rendered, a challenge based on evidentiary insufficiency will be rejected as long as there was sufficient evidence to support any of the theories submitted"]; *see also Griffin v United States*, 502 US 46, 59-60 [1991]).

Defendant also contends that the larceny convictions should be reversed because the testimony of Boelens, whom the trial court found to be an accomplice as a matter of law, was not corroborated as required by CPL 60.22 (1). This claim, however, is not preserved for review as defendant never raised this objection when moving to dismiss either at the close of the People's case or after all the evidence was before the jury (CPL 470.05 [2]; *People v Sala*, 95 NY2d 254, 260-261 [2000]). As an alternative holding, we reject this claim on the merits as there were numerous items of evidence, each of which was sufficient to satisfy the requirement that there be "some basis for the jury to conclude the accomplice testimony is credible" (*People v Besser*, 96 NY2d 136, 143 [2001]).

The court properly instructed the jury that it was not required to be unanimous as to whether defendant committed larceny by false pretenses or by embezzlement (*see e.g. People v Ponnapula*, 229 AD2d at 273), and we reject defendant's constitutional argument in this regard (*see Schad v Arizona*, 501 US 624, 630-645 [1991] [plurality opinion]; *see also id.* at 648-652 [Scalia, J., concurring]). In *People v Mateo* (2 NY3d 383, 406 [2004], *cert denied* 542 US 946 [2004]), the Court of Appeals rejected the claim that "due process requires that the command theory [of murder] be considered by the jury apart from the actual killer theory, and that the jury be unanimous on one theory or the other." In so holding, the Court relied on New York's "long history of treating actual killers and commanders as moral equivalents" (*id.* at 408). The same moral equivalence obtains with respect to thieves who steal by false pretense and those who steal by embezzlement. Indeed, as the People point out, beginning in 1942 the Penal Law defined larceny as the wrongful taking, obtaining or withholding of property with the requisite larcenous intent *"by any means whatever"* (former Penal Law § 1290 [L 1942, ch 732] [emphasis added]). Even assuming that the false pretenses and embezzlement theories should be viewed, under the facts of this case, as involving divergent views of defendant's conduct, he was not entitled to an instruction that the jurors must unanimously choose one theory or the other (*see People v Sullivan*, 173 NY 122 [1903]).

Defendant's other complaint about the court's charge—that it was "confusing" in instructing the jurors that they did not have to be unanimous on the theory of larceny but were required to be unanimous that all the elements of a particular larceny had been proven beyond a reasonable doubt—is unpreserved as defendant voiced no objection on this ground; we decline to review it in the interest of justice. As an alternative holding, we reject this claim on the merits. The court's instructions made clear what the term "elements" meant, and the jury expressed no confusion on this score. Moreover, during the charge, the court instructed the jury that it also had to be unanimous with respect to "all the facts necessary to substantiate each element." In isolation, this instruction is unclear, but on its face it imposes a burden on the prosecution, and it thus is not surprising that defendant did not object to it; nor does defendant complain about it on appeal. The court immediately went on to instruct the jury, as it did during the prosecutor's summation, that it had to be unanimous with respect to any particular false representation alleged by the prosecution. The prosecutor correctly opposed this instruction as an inaccurate statement of the law (*see People v Mateo*, 2 NY3d at 408-409). Accordingly, when the

instruction to which defendant belatedly objects is viewed in context, i.e., with the accompanying instructions to which he never objected, it is clear that the charge as a whole conferred a benefit upon defendant to which he was not entitled.

The court properly exercised its discretion in admitting uncharged crime evidence—i.e., the evidence relating to Ms. Munter's dealings with Zylka and Zylka's efforts to obtain a loan from Mr. Finkel—that was highly relevant to the critical issue of the extent of defendant's knowledge of Zylka's actual financial situation (see People v Alvino, 71 NY2d 233, 245 [1987]). The probative value of this evidence outweighed any prejudicial effect, which was minimized by the court's clear and repeated instructions to the jury explaining the proper use of the evidence.

The court also properly exercised its discretion in denying defendant's mistrial motion made on the basis of a remark made by the prosecutor at the end of the re-cross-examination of defendant, since the court's curative actions were sufficient to prevent any prejudice. Defendant's other claims of prosecutorial misconduct are unpreserved and we decline to review them in the interest of justice. As an alternative holding, we reject these claims on the merits and find no basis for reversal.

Finally, defendant's challenge to the sufficiency of the evidence underlying the convictions for the two counts of tampering with physical evidence has merit. Although the evidence supports the conclusion that the two false documents at issue were created by defendant to protect Zylka from his creditors, there is no valid line of reasoning nor any permissible inferences to support the additional and necessary conclusion that defendant's conscious objective in creating either document was that it "be used or introduced in an official proceeding or a prospective official proceeding" (Penal Law § 215.40 [1] [a] [emphasis added]). To the contrary, the only reasonable inference from the evidence is that defendant's intent was to deceive Zylka's creditors. If that effort were successful, neither document would be used or introduced in either of the two official proceedings, the Wheaton foreclosure action and the all but inevitable Evergreen bankruptcy, that the court instructed the jury without objection by the prosecution were at issue. In light of our determination with regard to the sufficiency of the evidence, we need not and do not reach either defendant's challenge to the weight of the evidence or his claim that his retrial on the tampering counts was barred by double jeopardy on the ground that the evidence at the first trial was legally insuf-

444

ficient on these same counts. Concur—Friedman, J.P., Nardelli, Gonzalez and McGuire, JJ.